CITY OF MEMPHIS, TENNESSEE, et al.

*v.*

HERBERT HOOD, JR., et al.

(*Jackson,* April Term, 1960.)

Opinion filed March 10, 1961.

FRANK B. GIANOTTI, JR., E. BRADY BARTUSCH, Memphis, ALAN M. PREWITT, JR., Nashville, JAMES M. GLASGOW, Assistant Attorney General, for petitioners.

JOHN S. PORTER, BURCH, PORTER, JOHNSON & BROWN, Memphis, for respondents.

Mr. Justice Burnett, delivered the opinion of the Court.

This is an eminent domain proceeding. The City of Memphis and the State of Tennessee have petitioned for certiorari on the one side, and the property owners have likewise petitioned on the other. We heretofore granted both petitions, briefs and assignments of error have been filed, and able arguments heard. After thoroughly reading these briefs, listening to the arguments, making an independent investigation and thin king of the matter for some days, we now have the questions presented for determination.

The city and state present the question of whether or not in determining the amount of incidental damages to the remainder of the realty owned by the property owners not condemned, is the jury entitled to take into consideration the fact that the flow of traffic in front of the property, a portion of which was taken, but ingress and egress not disturbed, is to be changed from two-way traffic to one-way traffic?

This Court some eighty years ago answered the question proposed in principle though at that time there was no such thing as modern highways and highway traffic of today. In *Moses v. Sanford,* 79 Tenn. 731, this Court had before it a question of whether or not a property owner, a part of whose property had been taken, was entitled to incidental damages for the reason that a bridge had been built over a river, and, in the building of same, part of his property where he had a ferry had been taken; whether or not he was entitled to damages by reason of the

traffic going over the bridge and not over his ferry. The Court in answering this question said:

"The profits of the ferry franchise were, however, destroyed, not by the condemnation of the land or the existence of a bridge pier erected thereon, but by the opening of the bridge for travel across the river. The land and the use of it for ferry purposes were not affected, but the value of the ferry franchise was depreciated by the new mode of travel created for the citizens by the proper public authority. And the question is narrowed down to this, is the loss of the profits of a franchise an incidental damage within the meaning of the statute, when the exercise of that franchise, as well as the franchise itself, is not impaired by the condemnation of the property to public use, or the existence of the pier?

"If a third person owned a ferry franchise exercised upon land either above or below the land condemned, it is clear that he could not claim damages by the condemnation, or the new mode of transit. If the defendant exercised his franchise on another lot than the land condemned, it is equally conceded he would be without remedy * * *."

Then the Court says and quotes from Judge Cooley's Constitutional Limitations thus:

"A franchise, although exercised upon the land, is 'other property' within the rule, if the exercise of the business be not affected by the condemnation. For, says the same author, 'No one has a vested right to be protected against consequential injuries arising from a proper exercise of public powers. The construction of a new way, or the discontinuance of an old one may

very seriously affect the value of adjacent property, but in neither case can the parties, whose interests may be injuriously affected enjoin the act, or claim compensation from the public.' Const.Lim., 481. The injury in the case before us was not by the erection on the condemned land, but by the opening of a new way by the county court, the proper public authority. It is *damnum absque injuria,* and must be borne accordingly."

When the fee to the street is in the public the adjoining owner suffers no legal injury under the common law because the public ceases to use the street. *Coyne v. City of Memphis,* 118 Tenn. 651, 102 S. W. 355; *Hamilton County v. Rape,* 101 Tenn. 222, 47 S. W. 416.

In Nichols on Eminent Domain, 3rd Ed., Vol. 2, Section 6.445, page 409, the author makes this very pertinent statement:

"An individual proprietor has no right to insist that the entire volume of traffic that would naturally flow over a highway of which he owns the fee pass undiverted and unobstructed. In fact, while under some circumstances and conditions he has a right of access to and from his own premises, he has no constitutional right to have anyone pass by his premises at all."

There are numerous decisions and in fact as far as we can find this legal statement is correct. Based on this statement the courts of all the States, except two (*Pike County v. Whittington,* 263 Ala. 47, 81 So.2d 288, and *In re McKay's Estate,* Ohio App., 121 N.E.2d 300), hold that "The applicable rule as to damages for diversion of traffic is the same under one situation as another; we test the claimed vested right to the current of public

travel by the same measure, whether twenty feet may have been taken off the back of an owner's lot without damage to the front where the flow of traffic was formerly found, or whether the relocated highway is situated twenty feet further away so that it be not necessary to take any portion of the owner's land. Obviously, the landowner's claim must rest or fall upon a decision whether she has a vested right in the flow of public travel, which once came by her door, but for which now, for the convenience of the general public, a shorter and more convenient route has been opened and is being employed. We hold she has no such right." *Board of County Commissioners of Santa Fe County v. Slaughter*, 49 N.M. 141, 158 P.2d 859, 863. This opinion from which we have last quoted analyzes the subject thoroughly, and the reasoning so far as we can determine is absolutely sound. This case cites cases from numerous other jurisdictions, text writers, etc., and we adopt the opinion herein by reference as being absolutely applicable to the question here under consideration.

██ Of course, the property owners fronting upon a public thoroughfare have a right to free and convenient access thereto. This right of ingress and egress attaches to the land. It is a property right, as complete as ownership of the land itself. But when we come to damages claimed by reason of the change of the flow of traffic, making a street a four-lane highway or diverting the traffic one way or the other, this comes from the exercise of the police power of the governing parties and such damages as result to one are non-compensable, as they are an incidental right resulting from a lawful act. The Supreme Court of Washington in *State of Washington v. Fox et al.*, 53 Wash.2d 216, 332 P.2d 943, in 1958 reached

this same conclusion. We can cite many cases from other jurisdictions, all of which except the two we have cited above hold this way. In the Alabama case, which was cited above holding to the contrary, the dissenting opinion filed thereto adopts the New Mexico case which we have referred to and quoted from and quotes it in full verbatim. We think this dissenting opinion far more reasonable that the majority opinion. In this dissenting opinion the court says this:

"The following illustrates the result reached by the majority. A and B could be adjacent landowners, each fronting 200 feet on a state highway. A's lot is 200 yards deep. B's lot is only 198 yards deep. Each has a filling station and a grocery store facing the highway and do a comparable business. The highway is relocated so as to pass 199 yards behind their places of business. It thus takes one yard of A's property but takes none of B's. A would be entitled to compensation because the flow of traffic on the old highway was then taken away from him while his neighbor B would, under practically all decisions in all the states, be entitled to nothing (citing an Alabama case holding to this effect). There is something about such a result which to me seems unfair and unjust." [263 Ala. 47, 81 So.2d 292]

Contrary to what we have said above, the property owner as well as the trial court and the Court of Appeals felt that the decision herein was controlled by our opinion of *State v. Rascoe,* 181 Tenn. 43, 178 S.W.2d 392, 395. In the Rascoe case this Court affirmed the allowance of incidental damages of some $12,000 for injuries to land not taken, because it was shown the taking of this adjoining land and a portion of the Rascoe land completely

blocked the road that had formerly lead from this farm for some three miles through part of this land to the Town of Smyrna, and it caused the property owner to have to go a roundabout way over a poor and winding bad road for some ten miles to the town, and had in effect made this farm a back-woods farm when formerly it was a road-front farm. There were also questions considered in arriving at this incidental damage of drainage pipes near the farm flowing a considerable portion over the land and with the prospects of future damage, and also entering into the element of incidental damage there was the apprehension that airplanes taking off in the direction of the dwelling at a low elevation might not attain sufficient elevation to avoid striking the house. It was on this theory and for these damages that this Court affirmed an award of incidental damages as fixed by the jury below. Our Court in this case reviewed a number of cases and distinguished them and said that the damages for the taking of the land were one thing and that ''In the second instance the owner of the land is treated as one offering it for sale at a fair price and the condemner is treated as an intending buyer, neither party being under any stress which would force the sale or the purchase. As the seller in such a transaction would take into consideration damage to the remainder of his land in selling part thereof, so the law in fixing his compensation bases his damage on the same consideration.'' Then later on this Court quotes from the Dudley case (*Lewisburg & N. R. Co. v. Dudley,* 161 Tenn. 546, 30 S.W.2d 278) that, ''the fact that such special injury is common to all property in the community would not exclude consideration of the special injury as an element to be considered in assessing the incidental

damages." Thus it was that the incidental damages above referred to were allowed in the Rascoe case.

As we view it the damages to be allowed in the instant case are a far cry from the related kind of damages as allowed in the Rascoe case. In the instant case the damages claimed are those as a result of the lawful authorities acting in changing the traffic and such damages are non-compensable to anyone, because if we allowed damages in this way to everyone who might claim that the traffic as diverted caused this and that damage to them it would completely obstruct the building of roads and highways by the public authorities. Such damages that might arise from the change in flow of traffic are so speculative for many obvious reasons that they do not cause a "special injury" as is referred to in the Rascoe case.

■ Thus it is that we conclude that it was error for the trial judge to allow this evidence and to instruct the jury that they could take such evidence into consideration in determining the incidental damages. Of course, a proper measure of damages in cases of this kind is the decline in market value of the property, but such must be tempered by an exclusion of the loss of value due to a non-compensable injury as this was.

The property involved in this litigation was located on the north side of Poplar Avenue in Memphis, Tennessee, just east of the Aulon Viaduct. It had been originally subdivided by the owners, Mr. and Mrs. Hood, into eleven lots but in this litigation these eleven lots are divided into three parcels. Parcel No. 1 consists of lots 1 and 2 and is located at the extreme western side of the property. Located on this Parcel 1 was a two-story brick

office building which had been demolished and removed because it was situated on a portion of this parcel of land which was taken by the State. There is no question raised by either party as to the allowance for the land actually taken.

Parcel 3, consisting of lots 3, 4, 5, 6, 7 and 8, is located immediately east of Parcel 1, and on this parcel is located a modern brick drive-in restaurant. No portion of the restaurant building was taken, but twenty-four automobile parking spaces along the south and in front of this restaurant were taken. And it is fair to say that under this record and due to the change in the flow of traffic this restaurant is no longer in operation.

Parcel No. 2, made up of lots 9, 10 and 11, is located immediately east of Parcel No. 3 on the extreme eastern portion of the property. On this lot was located a one-story building used as a pick-up station for a laundry and dry cleaners. No portion of this building was taken but six parking spaces immediately in front and along the south line of this building were taken.

The jury assessed the value of the property of Parcel No. 1 at $24,272.60 and assessed incidental damages to the remaining portion of Parcel No. 1 at $9,700.

To Parcel No. 2 the jury assessed a value of $1,575 for the land actually taken and incidental damages at $6,750.

To Parcel No. 3 the jury placed a value for the land taken at $9,720 and assessed incidental damages to it of $40,000, as this was the property occupied by the restaurant.

Thus it is on this feature of the case, the case must be reversed and remanded for the purpose of fixing the

incidental damages with the exclusion of that portion of the damages with reference to re-routing traffic hereinabove referred to.

The other question, raised in the present litigation, is raised by the petition of the property owner. This question is, are the property owners entitled to compensation for the fair market value of "the disputed strip" of land as taken? The Court of Appeals answered this question in the negative and denied the petition of the property owners.

In 1948 the property owners had a plat prepared dividing their property into the eleven lots, hereinbefore indicated, and in this plat they proposed dedicating 14½ feet along the south margin of this property for the purpose of widening Poplar Avenue. The land so to be dedicated was 14½ feet wide and 232.1 feet long. This plat or plan of subdivision was approved by the City Planning Commission and also approved by the Board of Commissioners of the City of Memphis in 1948. The plat was registered in the Register's office of Shelby County and recorded in a plat book in that office. Subsequent to this purported dedication no action was taken by the City of Memphis to widen Poplar Avenue or to use this dedicated strip in any manner until the present condemnation proceedings were begun. Buildings were put on this property by the property owners and they landscaped the dedicated strip and used it as an entrance to their property as well as for the erection of a sign for the restaurant which was on the property.

At the time these condemnation proceedings were filed in 1958 Poplar Avenue was 66 feet wide with two lanes of eastbound traffic and two lanes of westbound traffic with no dividing lane separating these lanes of traffic.

Under the present condemnation proceedings, the plan of expansion and road improvement, Poplar Avenue is to be much wider. There will be a division of westbound traffic along the east line of the property owner's property for two lanes to three lanes. A new road will run diagonally westerly from the official southeast corner of the property owner's property northwestward across the property, then down the hill southwardly and under the viaduct. This new road will carry one and maybe two lanes of westbound traffic which will peel off of Poplar Avenue beginning at the southeast corner of the Hood property.

There will be two lanes of traffic running eastwardly across the viaduct along the south side of Poplar Avenue and south of the property owner's property. In addition, another street will be built bringing one lane of the eastbound traffic up the hill on the south side of the viaduct. This third lane of eastbound traffic will merge with the other two eastbound lanes of traffic, coming off the viaduct, and on the south side of Poplar Avenue, south of the southeast corner of the property owner's property.

A concrete media about 2 feet wide separating the eastbound traffic and the westbound traffic will be constructed along the center of Poplar Avenue.

The dedication of 1948 as proposed by the property owners was duly approved by the municipal departments of the City of Memphis as above indicated. The property owner now questions this dedication in that it is said that there was no acceptance by the city of the property because the dedication being merely approved is not a dedication and an acceptance of this property. Section 13-605, T.C.A., is relied upon in this argument. This

Section of the Code provides that the approval of a plat shall not be deemed to constitute a dedication by a municipality. Section 13-609, T.C.A., provides in effect that the Chapter in which Section 13-609 is a part shall not be binding and effective where there are private statutes to the contrary and that such private statutes shall remain in force and effect. Chapter 162 of the Private Acts of 1921, which Act applies to Memphis and Shelby County, Section 8 thereof provides that "The approval of the City Planning Commission or Legislative body shall be deemed an acceptance of the proposed dedication, but this shall not impose any duty upon the municipality, concerning the maintenance or improvement of such dedicated parts, until the proper municipal authority shall have made an actual appropriation of same, by entry, use or improvement." Thus it is that we conclude that the statutory provision, above referred to (13-605, T.C. A.), is not applicable herein, and that the only thing necessary for the dedication was the approval by these municipal authorities as was done.

Next it is contended that there was a non-user of this property for over ten years and no entry and consequently it did not constitute a dedication, and second, the use to which the city is now attempting to put this property is not the use for which it was dedicated in 1948, and that thus the property owner is entitled to a fair cash market value of the property, since there was a non-user and a different use now being put to the property of the value of this property.

■ Of course, basically back of this argument is the legal proposition that the owner of the property, who makes a dedication, retains the ultimate fee which is

unaffected by the dedication, and that a subsequent taking for another purpose either by the government of the municipality has not acquired anything more than a mere easement in the property by this dedication. The property owner cites as authority for this proposition *Carroll County Board of Education v. Caldwell,* 178 Tenn. 671, 162 S.W.2d 391. In this case the owners of property in Carroll County dedicated it to the county for school purposes; the County School Board and the Department of Education built a school building on this property which was retained for some 26 years when the Federal Government came along and sought this property for Federal purposes. A sum of some $5,000 was paid and then it was agreed that the total value of the property was some $24,000 in addition to the $5,000 that had been paid. The question came to this Court by the heirs of the fee in the property as to what portion, if any, they were entitled from this sum. This Court held that the School Board was entitled to the value of the building and that the owners of the fee in the land were entitled to the value of the land as of the time that they dedicated it to the School Board. This action was on the theory and basic fact that the property had been put to an entirely different use from that as dedicated by the owner of the land originally, and when this was true such distribution should be made of the proceeds as was done in the Carroll County case. This though is a far cry from the factual situation in the present case. In the present case the land was originally dedicated to the city for the widening of Poplar Avenue. The mere fact that Poplar Avenue was now being widened more, or in a different manner from that which the property owners contemplated when they dedicated this property does not change the use for

which the dedication was made in the sense as the rule is applied in the Carroll County case, supra.

"Where property is dedicated for use as a street or highway, the use thereof is not limited to the means of travel in use at the time of the dedication, but includes the right to use improved methods of travel." 26 C.J. S. Dedication sec. 66, page 562.

■ The fact that this disputed strip is now going to be only half used as a street and the other for sidewalks and things of that kind is all in a sense part of the widening of the street, even though this particular thing, the way it is now done, was not in the minds of the parties at the time they dedicated it. The use that the property owner made of this property for ten years preceding the present action after dedication does not defeat the rights of the municipality under the dedication.

"Use by the owner of the dedicated property that could properly be made in connection with the right of the public with the permission of the municipality does not defeat its rights." 26 C.J.S. Dedication sec. 63, page 553.

After this quotation there are other cases cited even where fences are built across the property and things of that kind. Examination of these cases and the authorities clearly convinces us that there was no abandonment by the city, and under its act the dedication remained in force and there has been no misuser which would abandon or void the dedication herein.

■ The same authority that we have quoted from above, C.J.S., page 555, also makes this very pertinent and apt statement:

"Except where it is otherwise provided by statute, it is very generally held that after acceptance, or where acceptance is unnecessary to bind a dedicator, a mere negative non-user, or delay in beginning sue, accompanied by no act showing intention of never using, and not complicated by actual user or by some private party, does not constitute an abandonment and has no effect on the rights of the public, no matter how long the nonuser is continued."

The authorities back of this statement support it and to our minds they are clearly reasonable and should control a factual situation as presented by this record. Then, too, we have our case of *Hardy v. City of Memphis*, 57 Tenn. 127, which is to the same effect.

■ Thus it is after careful consideration we are satisfied that the property owner had no rights in the present litigation for the value of the land taken for this, what is known as "the disputed strip". Thus on this question the Court of Appeals is affirmed.

After a careful consideration, much study and investigation of the taking of this land and this "disputed strip" we have concluded that it is not compensable, and that as to the question of incidental damages, which should be offset by incidental benefits, that the introduction of the evidence of the change in traffic and the street from one way or the other so long as the rights of ingress and egress are not disturbed, that as to that feature of the proof the property owner is not entitled to rely upon it. Thus the case is reversed on that feature and remanded for determination of incidental damages excluding the feature which we have discussed fully at the beginning of this opinion.

PREWITT, CHIEF JUSTICE, not participating.·

## On Petition to Rehear

BURNETT, JUSTICE.

The Hoods through able counsel have filed a forceful, dignified and respectful petition to rehear in this case. We have carefully read and re-read this petition and authorities therein quoted from at length and others. After having done so, we are now in a position and do respond thereto in this opinion.

The answer to the petition merely states that it is a reargument and consequently should not be considered by us under Rule 32 of this Court. Due to the fact that every member of this Court was once a practitioner we realize the fact that it is almost impossible to file a petition to rehear without again rearguing what has been theretofore argued, especially when it is done in a slightly different manner and knowing what was in the mind of the Court when the opinion was written—this not being known at the time the original briefs and arguments were made.

This petition likewise takes up at great length a case that was pointed out by us of *Moses v. Sanford* in our original opinion. This case was not cited by either party in the original briefs and apparently was overlooked by both sides. We are satisfied more than ever after a re-reading of the Moses case that the principle here involved was determined in that lawsuit. The opinion in the Moses case is taken up in this petition and it is attempted to show that this case is not controlling in the question here involved primarily because there was a franchise involved in the Moses case which is not involved

in this case. That is not the point in either lawsuit by any stretch of the imagination. A clear reading of the Moses case shows that the claimed incidental damages there were to a franchise in running the ferry across the river because the traffic was diverted over a bridge rather than on this ferry. It is now said that this franchise is not property. True it is not property, but if in a condemnation suit, or a suit for eminent domain, a franchise had been injured by the taking of property, incidental damages would have responded to the injury of this franchise just like anything else. The fact that it is not property like real property isn't the point at all. The point is that when this bridge was built and traffic went another way the mere fact that it went over the bridge and didn't go over the ferry, where the franchise was, was not allowed in that case as incidental damages because it is *damnum absque injuria*. That is all that the incidental damages that we disallowed are in the instant case. The mere building of a main arterial highway, wherein the public authorities directed that traffic should go one way or the other, does not respond or cause damages to property for reason of the fact that traffic is thus diverted and cannot come in and spend their money on this property without going a roundabout way.

In the petition to rehear and in this reargument the cases of *Illinois Central R. Co. v. Moriarity,* 135 Tenn. 446, 186 S.W. 1053, and *Lewisburg & N. R. Co. v. Hinds,* 134 Tenn. 293, 183 S.W. 985, L.R.A.1916E. 420, are cited, quoted from at length, and it is argued that they are authority for allowing the incidental damages that we have disallowed by our original opinion. Both of these cases were cited, quoted from and relied upon in *State v. Rascoe,* which is cited in our original opinion, and upon

which the present petitioners relied and were successful in convincing the two lower courts was applicable to the present situation. At the time of our preparation of the original opinion herein we read both of these cases. We have re-read them since the petition was filed. Over a period of more than a quarter of a century as a member of one of the three courts, the Circuit Court, the Court of Appeals and this Court, the writer of this opinion has read these two opinions, and particularly the Hinds opinion, many times. The Hinds opinion takes up more than sixty printed pages in a volume of the Reports. It covers almost every conceivable kind of case with reference to damages and incidental damages in eminent domain suits, quotes copiously from various and sundry authorities, and arrives at the conclusion that in eminent domain or condemnation suits the measure of incidental damages should be measured largely very much like they are in *ex contractu* rather than in *ex delicto* suits. In this opinion can be found statements supporting the argument for these damages here on behalf of the petitioner as well as statements to the contrary. Be this as it may, the question involved in the Hinds case was in no sense of the word related to the question involved the case now before us. The question of damages involved in the Hinds case was closer to the question involved in the Rascoe case which we have fully considered in the original opinion. The question of damages involved in the Moriarity case has no relation whatsoever to the question of damages sought in the instant case. The *cul de sac* situation does not apply to the factual situation in the instant case at all, as it did to some extent in the Moriarity case. There are quotations from other courts given in the Moriarity case which apply to the factual situation

in the instant case. The Moriarity case though does recognize that "it is sometimes quite difficult to distinguish between the exercise of the police power and the exercise of the power of eminent domain." [135 Tenn. 446, 186 S.W. 1056] We recognize this fact, but feel that unquestionably when all States in the Union have passed on this subject with the exception of two, cited in our original opinion, and they have and do recognize that the damages here sought are due by reason of the exercise of the police power rather than that of eminent domain, then that we certainly cannot be severely criticized for accepting this viewpoint, especially in light of an unbiased reading of the language of this Court in the Moses case relied upon by us. We therefore think that what we said in our original opinion was absolutely correct and we strictly adhere thereto.

It is again reargued that the petitioners are entitled to compensation for the fair market value of "the disputed strip" of the land taken. We have again considered this matter and since there is no new authority cited we are satisfied that the two lower courts were correct in their conclusion therein, which we affirmed in our original opinion.

In arriving at our original opinion herein, as well as our conclusion on the petition to rehear, this has not been done hastily or without a great deal of thought and investigation. In working up the matter originally we spent some ten days, read all authorities cited in both briefs, as well as doing a great deal of independent investigation, and it was after doing so that we arrived at the conclusion which we did. It is not an easy matter to disagree with two lower courts. It is much easier, if you

are going to take the easy road, to deny the writ. When you are conscientious, as everyone on the Court is, in trying to arrive at the right conclusion as you see it under the law and the facts, then it is necessary to grant the writ if the Court thinks it is necessary to do so and to disagree in the result and then from authority and experience and the facts of the case to arrive at the conclusion that the Court thinks these things justify. After having done this, we have come to the conclusion that the opinion as originally handed down herein is correct, and the petition to rehear must be denied.

PREWITT, CHIEF JUSTICE, not participating.