Dorothea E. Donaldson, J.
This is an action for damages for the appropriation in fee hy the defendant of 0.942± acres of land on July 23, 1958. The taking was accomplished to provide a power line right of way for electrical transmission facilities of the New York State Power Authority.
The appropriated land -is designated Parcel No. 1247, on Map No. 1247 and is located in the rural portion of the Town of Lewiston in Niagara County. Prior to the taking the land in question formed part of the Cate of Heaven Cemetery, owned and operated by the Diocese of Buffalo, a corporation by virtue of chapter 568 of the Laws of 1951. The general area has been dedicated to use as a cemetery since 1897. From that date until August 16,1946 title was vested in two Roman Catholic churches in Niagara Falls. However, the cemetery was operated and managed by Riverdale, the adjacent cemetery to the south, until 1942 when operation and management was assumed by the Diocese. In 1946 the Diocese took title to the premises and, *339 in 1954, entered into a boundary-line agreement with River-dale whereby the easterly end of the south boundary was straightened. While the cemetery, at the time of the taking, fronted on Military Road on the east, Lewiston Road on the west, and Holy Trinity Cemetery on the north, as well as Riverdale Cemetery on the south, access was solely through the last named by virtue of an easement permitting automobile, carriage and pedestrian traffic to enter and depart through the Lewiston Road entrance to Riverdale.
At trial it was deemed convenient to regard the cemetery as divided into three units, vis., the older developed section, the newly developed section, and the undeveloped section, with areas respectively of 15.555± acres, 3.467± acres, and 9.586± acres. Like nomenclature will be utilized in this memorandum. The older developed area forms the western part of the cemetery, the newly developed area, the central, and the undeveloped portion, the easternmost. The appropriated area is in the undeveloped section and is roughly triangular in shape, 317.28± feet by 385.79± feet by 260.55± feet, the last dimension constituting the frontage on Military Road.
The claimant has proposed a fair market value of the parcel, considered as undeveloped cemetery land on July 23, 1958, of either $25,322.62 or $26,375, depending upon the method of computation used, plus $8,500 as consequential damages. The State, on the other hand, urges a fair market value of $7,200, such sum resulting from adoption of a theory that the highest and best potential use of claimant’s land was not as a cemetery at all but rather as property to be held for residential subdivision.
By fair market value is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses to which the land was adopted and might in reason be applied. (4 Nichols, Eminent Domain [rev. 3rd ed., 1962], § 12.2, subd. [1].) It must, however, be recognized that market value is always based on hypothetical conditions. Hence it is never necessary to show that there was, in fact, a person able or willing to buy. So while market value is still the measure, in the case of property held or improved in such a manner as to render it virtually unmarketable, means other than the usual methods of ascertaining value must, from the necessity of the case, be resorted to. It is, therefore, proper in such cases to deduce market value from the intrinsic value of the property, and its value to its owners for their special purposes. (4 Nichols, op. cit., § 12.32.)
*340 In attempting to determine this value the court must consider the evidence offered in view of the two leading New York decisions bearing upon the points involved (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37; Mount Hope Cemetery Assn. v. State of New York, 11 A D 2d 303, affd. without opn. 10 N Y 2d 752).
Two general theories of evaluation of undeveloped cemetery land have evolved. The first regards the land appropriated as a current liability rather than an asset because money would have to be expended upon it before it could be sold and used for sepulture. Since the land is not in use it has no present productiveness; it has no current earnings. While it may possibly produce future earnings, these are considered speculative and without a dependable foundation. The taking of such land thus does not serve to decrease a cemetery’s current revenue. The only measure of damages then is the replacement cost, i.e., the market value of similar property. (Laureldale Cemetery Co. v. Reading Co., 303 Pa. 315.)
The second theory, and that so far adopted by the New York courts, proceeds upon the premise that attention must rather be focused upon the intrinsic nature and potentialities of the property itself. The income derived from the sale of burial sites in the cemetery in question is determined to be an ascertainable amount not based on speculative considerations. It should be observed that evidence of such income is introduced not to show future business profits nor the loss thereof; it is introduced to establish present value, i.e., “ what a willing buyer would pay in cash to a willing seller ”. (United States v. Miller, 317 U. S. 369, 374.) In this situation the court says, in Cementerio Buxeda v. People of Puerto Rico: “ the inquiry would properly encompass an investigation of the facts as to the capacity of the parcel for burials, its location, past sales in this and other similar cemeteries, the reasonableness of the prices charged for individual burial sites, and in general its future prospects as they would appear to ‘ a willing-buyer ’ * * * The fact that there was no such market is favorable to its admission [citations omitted]. The income derived from the sale of burial sites in this and other cemeteries was an ascertainable amount not based on speculative considerations. The income was not such that the skill of the management of the property was important. A prospective purchaser would obviously look at the sale of burial sites made, the capacity of the cemetery, the cost of interment, etc. This is not to say that valuing the parcel is merely a problem in multiplication. Bather, such figures as sales and cost of interment, among *341 others, are factors which would he considered by a prospective buyer and would help to form a basis for valuing the tract before and after the condemnation.” (196 F. 2d 177, 180-181 [1st Cir., 1952], cert. den. 344 U. S. 876.)
While Hew York has adopted this view in St. Agnes and Mount Hope (supra), the State in the case at bar seeks to achieve a different result by attempting to show first, that the method of evaluation in Laureldale Cemetery Co. v. Reading Co. (supra) has not been foreclosed by the Hew York decisions and, second, that the proper application of the formula developed in St. Agnes and Mount Hope in the instant case would lead to such a manifestly unjust result that adoption of different criteria of highest and best use of the property in question is mandated.
The court agrees with the State that no hard and fast rule of evaluation has been established in this jurisdiction. The Court of Appeals has stated: “ Speaking generally of methods of valuation, this court stated in Matter of City of New York (Fourth Ave.) (255 N. Y. 25, 30): ‘ The experts, as well as the judge, may have many different methods in arriving at the same point or at the value of the whole. These considerations are mere matters of evidence to prove facts. As long as competent evidence is received, and none excluded, no rule of law is violated, if the main purpose is served of ascertaining the value of the whole ’.” (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41, supra.) The Court of Appeals goes on to set forth three categories of cases involving lands subjected to restricted uses which nevertheless allowed the properties to be evaluated on the basis of surrounding lands. These included cases where no evidence was introduced valuing the land for purposes to which the property had been devoted, or such use had been abandoned or the property had not been developed and improved for the restricted use intended. In considering this last group the court distinguished Laureldale (supra) and noted that the Pennsylvania decision involved a cemetery only three years old, a ‘ ‘ minute part ” of whose 117-acre tract had been developed with only 417 interments having been made. Furthermore the Laureldale property consisted of three tracts of land separated by highways and a railroad for the benefit of the latter of which the condemnation was made. This differed from the situation in the case under review by the Court of Appeals in that St. Agnes Cemetery had been active for 85 years with over 50,000 interments having taken place. The appropriated land had been acquired 14 years before the taking as essential to its *342 needs. Furthermore, all the land held by the claimant consisted of one single undivided tract. Also, the cemetery, prior to the taking, had entered into a contract with the Cemetery Service Company of Kansas City who planned and designed several shrine developments for the area which subsequently was appropriated. Plans were completed for sale of lots therein. (Cf. Mattydale Shopping Center v. State of New York, 303 N. Y. 974.) The court found that the weight of authority supported the rule that “ if the land taken is an integral though unused portion of a well-established cemetery, that is, a portion of a cemetery in which there have been no interments and no sales of graves, the property should be appraised on the basis of its value for cemetery purposes. The fact that there were no burials in the condemned or consequentially damaged parcels is proof of damage to the cemetery * * *. The quantum of damage depends on the value of the plots.” (3 N Y 2d 37, 44.)
Examining the status of the cemetery in the instant case in the light of the foregoing, the claimant and its predecessors in interest had been established for some 61 years; a substantial portion of the cemetery had been sold (10,647 graves out of a purported total availability of 24,605); the cemetery property consisted of a unitary whole of which the appropriated parcel had from the outset formed a part; and plans for the development of the appropriated area were initiated in 1954.
Turning to the second of the State’s major contentions, the court finds that there is no judicial precedent for the method of computation which is advanced. Initially it should be observed that an award made under the theory of Cementerio Buxeda v. People of Puerto Rico (supra) involves first a determination of the number of graves in the appropriated area, due regard being given to the fact that varying amounts of property must be withheld from the market for use as roads, paths, service areas, decorative purposes, etc. The gross selling price per grave is established on the basis of the past history of the cemetery and from this amount are deducted, where applicable, the costs involved in developing and selling the land, the costs of current maintenance and the amount invested in a fund adequate to provide earnings sufficient to pay for future maintenance in perpetuity. The balance remaining represents the net profit resulting from the sale of each burial site; when multiplied by the number of grave sites appropriated, a sum is derived which would have represented the value of the land to the owner had all sites been sold at once. Had there been no appropriation, however, this sum would have *343 been realized not at a particular point in time but rather by more or less periodic payments spread into the future. Hence, a method must be found whereby to equate such payments to a lump sum paid in theory at the time of the taking by the defendant. This is accomplished by ascertaining initially the economic life of the cemetery. An average is struck portraying the number of graves which have been sold per year over a period of time reasonably sufficient to indicate the sales activity of the cemetery. This average figure is divided into the number of grave sites unsold in the cemetery before the appropriation. The result is the apparent economic “life” of the cemetery as it appeared before the taking, i.e., that length of time expressed in years during which income would have resulted from sales. The total net income which would have been realized from the appropriated area is divided by this figure resulting in an annual return from sales made in that area. By the adoption of an appropriate rate of return and the use of tables of compound interest functions which show the present value of an ordinary annuity of one per annum (the “ Inwood ” tables), the value, at the time of the appropriation, of a specified number of payments (derived from the economic “ life ” of the cemetery and the annual return) may be determined. By rate of return, it should be emphasized, is meant the percentage figure at which the claimant will be able to make a conservative investment which will produce payments of principal and interest on future dates equal to the anticipated future earnings.
The State would have us adopt a different course of action. By taking the position that a willing buyer of cemetery property would be desirous of obtaining a fair return on his purchase, certainly a not unreasonable posture for an investor, the defendant would have the lump sum payment reflect first, the desire of the investor to reap a substantial return, second, the risk associated with a long-term operation and third, the relative difficulty to be encountered in disposing of such an investment prior to maturity.
In advancing such criteria, however, the court feels that the defendant, in attempting to cast the ‘ ‘ prospective buyer ’ ’ into a role of “prospective investor ”, overlooks the rationale for the admission of evidence, of sales of burial plots in the first place. As the courts have repeatedly reiterated (e.g., St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 45, supra), such evidence is not admitted to show profit. Its sole purpose is to enable the court, not having the benefit of more customary methods of evaluation, to obtain some factual indicia of the *344 value of the land by showing its worth to the owner or to the prospective buyer. In this frame of reference and under the circumstances of the case at bar, a “ prospective buyer ” of part of the Grate of Heaven Cemetery could only be another Diocese desirous of obtaining a dedicated burial ground.
The defendant further argues that the parcel which constituted the appropriated section was so remote from the developed portion of the cemetery as to render its value for burial purposes moot. The deféndant buttresses this view by showing that if a 12% return of investment is predicated (a perhaps not unreasonable figure where a cemetery is viewed as a profit-making operation) by adopting the claimant’s own figures for operating costs and expenses, revenues, etc., and by agreeing that without the taking the cemetery had a sufficient supply of land for sale purposes for a period of 60 years and that without the portion appropriated the claimant’s lands would be adequate for its purposes for some 56 years, the value of the cemetery before and after the taking indicates a loss by the appropriation of only $68.70. There are two objections to this computation other than the adoption of the 12% interest rate, however. First, the practice in New York has been to reject as speculative the use of a timetable specifying the order in which sales would be made; hence, all unsold grave areas within and without the appropriated parcel are totalled and averaged. The second objection lies in the fact that the record shows that it was the intent of the Diocese to initiate development of the tract in a westerly direction from Military Road following the construction of an entrance thereupon. This would have the effect of postponing the development of the central part until near the end of the cemetery’s economic life, and of rendering the development of the appropriated parcel imminent.
There remains to be considered the quantum of damages.
The parties agree and the court finds that there were left unsold, at the time of the appropriation, 13,958 graves. The parties further agree and the court finds that, based upon a recapitulation of the five-year period immediately preceding the taking, the cemetery averaged sales of 230 graves per year. Utilizing these figures in the manner set forth above, the economic life of the cemetery is found to be, to the nearest whole figure, 61 years. The parties agree and the court finds that the average payment received per grave disposed of between 1955 and 1959 was $85.28. Although the claimant introduced a map showing the proposed layout of the appropriated area upon which were shown 961 graves as wholly or partly taken *345 or within the “ setback ” area, the date of the survey coincides with the date of the taking and the court prefers to use the defendant’s figure of 938, derived as it was from the cemetery’s past experience in establishing 996 graves per acre.
A cemetery belonging to, or operated, supervised or controlled by or in connection with a religious corporation is not subject to the requirement that a perpetual care fund be established. (Membership Corporations Law, § 71.) Where, however, as in the case at bar, such perpetual care is afforded, it becomes a charge upon the land, diminishing its value for purposes of determining the proper recompense for its appropriation. The court finds no merit, however, in the State’s contention that the value of the appropriated parcel must be deemed to be diminished by an amount proportionately sufficient to capitalize the admittedly inadequate perpetual care fund of the entire cemetery. While the cemetery may have incurred contractual liabilities to the vendees of its gravesites for the perpetual care thereof, and while the logical and, it may be, the only source of capital for a fund therefor will be the return from future sales, it does not follow that the value of unsold land is thereby reduced. Bather, this operation is merely an allocation of future profits and, as such, again plays no part in the determination of present value.
Therefore, the court determines that a reasonable yearly expenditure for maintenance in perpetuity of ,942± acres would be $527. The amount required to earn such a sum annually at 4% interest is $13,175. (See discussion of interest rates, infra.) The court determines that the reasonable development cost of the appropriated parcel, based upon the past experience of the cemetery, would have been $3,977. The parties agree and the court determines that a reasonable sales cost per grave would have been $10.
Utilizing these figures, the net income from the sale of graves in the appropriated area would have been $53,461. This figure would have resulted in a predicted annual income of $876. At a rate of return of 4%, the present value of 61 payments of such a sum is $19,898.
The claimant has urged that it is entitled to utilize an interest rate of 3%, such a figure resulting from an examination of the yields of Federal obligations available to an organization such as the claimant’s upon the date of the taking. The court is of the opinion, however, that 4% represents a more realistic rate for the purposes of this litigation, both in computation of the amount required for the permanent maintenance fund (where the higher rate operates to the claimant’s benefit) as well as the *346 discount rate. The range of securities available to fiduciaries under the provisions of section 21 of the Personal Property-Law affords the most judicious and conservative trustee the opportunity to achieve, through a balanced portfolio, yields in excess of those proposed by the claimant.
The court declines to make an award for severance or consequential damages. The claimant has not shown by a preponderance of the evidence that the appropriation will either prevent the erection of a suitable entrance on Military Boad or impose a compensable burden on the claimant in realigning the projected roadway leading thereto. Nor has there been a showing that the existence of adjacent power lines will materially damage the remainder.
The court has view the property.
The claimant is awarded the sum of $19,898 for all damages, with interest thereon from July 23, 1958 to the date of entry of judgment herein.
The award to claimant herein is exclusive of the claims, if any, of persons other than owners of the appropriated property, their tenants, mortgagees and lienors having any right or interest in any street, lake, drainage and irrigation ditch or channel, street, road, highway, or public or private right of way or the bed thereof within the limits of the appropriated property or contiguous thereto; and is exclusive also of claims, if any, for the value of or damage to easements and appurtenant facilities for the construction, operation and maintenance of publicly owned or public service electric, telephone, telegraph, pipe, water, sewer and railroad lines.