STATE HIGHWAY COMMISSION, Appellant

v.

AMERICAN MEMORIAL PARKS, INC., et al., Respondents

(144 N.W.2d 25)

(File No. 10149. Opinion filed July 14, 1966)

**Frank L. Farrar,** Atty. Gen., **John B. Wehde, Carl W. Quist,** Sp. Asst. Attys. Gen., Pierre, for plaintiff and appellant.

**Bangs, McCullen, Butler & Foye, Geo. A. Bangs, Joseph M. Butler,** Rapid City, for defendants and respondents.

BIEGELMEIER, Judge.

This is a condemnation proceeding. In 1936 W. G. Lacey became the owner of the 30 acre tract of land involved under plans made by persons interested therein to create a cemetery. The topography of this tract was such that approximately the west 16 acres was unsuitable for burial purposes. The east 14 acres was then bisected by U. S. Highway 16. As part of the plan defendant Pine Lawn Memorial Park, Inc., herein referred to as Cemetery Corporation was organized to operate the cemetery and Lacey entered into a contract for deed with it which in much detail set up their business relations. Perhaps because cemetery corporations may not appropriate any profit to the corporation or its members, one of the many provisions was that Lacey retain title to the real estate, but upon deposit of 50% of the proceeds of the sale of any lot or $50 if the lot sold for less than $100 he would execute a deed for that lot to the Cemetery Corporation. Pursuant thereto that part of the 14 acres west of Highway 16 was platted in 7,441 burial spaces with drives, roadways, etc. A $14,000 chapel was erected on this west tract and a well with water distribution system installed at a cost of roughly $18,000. Later a $20,000 house in which the caretaker lived was built. There was testimony that the chapel and house were

to serve both the tracts on the east and west sides of Highway 16, though they were placed on the west side; no part of the water distribution system was ever extended to the east tract as it was inadequate for that added area. Through November 1963, the time of trial, 2,670 burial places had been sold—all from the tract west of the highway. There was no evidence of the number of interments. As 4,771 burial places remain unsold west of the highway, there was no occasion for the sale or platting of the tract east of the highway, nor was the east tract platted until August, 1957. Mr. Powers, one of defendants' witnesses and originally interested in organizing the cemetery, testified he was a friend of the Chairman of the State Highway Commission, and was told by him in 1956 that the new highway was to be built which would take the east tract and asked him "not to make any burials in that portion". After a public hearing on location of the road held in the spring of 1957 a plat of the 7.46 acre tract east of Highway 16 was filed. It indicated 6,248 burial places making a total of 13,689 burial places in both tracts. Other than the filing of the plat, nothing had been done to change or improve the east tract and it remained in its original natural state. The condemnation suit for the proposed highway does not take any part of the tract west of the highway; does not interfere with access thereto, nor change Highway 16. It does take practically all of the tract east of Highway 16, and for purposes of the trial and this appeal the parties assume that the whole of the tract east of the highway was appropriated. The trial judge stated before the trial and in the rulings during the trial that the rule of damages for the taking of the tract east of Highway 16 would be that substantially set out by the Supreme Court of Nebraska in Graceland Park Cemetery Company v. City of Omaha, 173 Neb. 608, 114 N.W.2d 29.

Defendants Ed. H. Lacey and Angela E. McConville apparently were two heirs of W. G. Lacey to whom, the opening statement said, a portion of the contract passed. The record shows a portion of the W. G. Lacey contract "passed" to defendant American Memorial Parks, Inc. Witness Robert G. Powers testified he was principal stockholder and Secretary of American Memorial Parks, Inc. and that it had a sales contract with the Cemetery

Corporation by which a commission of 40% of the sales price of every pre-need lot sold by American Memorial Parks, Inc. was to be paid to it; that the contract had not been in effect for 10 or 15 years. Pre-need lots, as the term implies, are generally sold in special campaigns prior to actual need. He was secretary of a 39,922 burial site cemetery corporation at Sioux Falls, South Dakota, which he organized and for 'which he purchased and platted the ground and conducted all the developments and sales since 1933. He selected the 30 acre tract involved here, and was instrumental in its purchase, financing by Lacey, and the organization of defendant nonprofit Cemetery Corporation. He testified the average number of sales the first half of the cemetery's existence was 56 and 92 and the last half roughly 100. The exact figures in the record show: A sales campaign resulted in 442 lots sold in 1936 and 248 in 1937; in the seven years from 1938 to 1945 the total was 157; in 1945—337; 1946 through 1953—165; 1954—505; 1955—367; 1956—236 (three campaign years); 1957 through 1963—211. Average annual sales for the 28 years were 96 lots a year—90 the first 14 years and 102 the last 14 years. Rapid City doubled in population from 13,900 in 1940 to 25,300 in 1950 and tripled to 42,400 in 1960. Powers was not aware of the mortality rate, yet he expressed the opinion the 11,000 remaining grave sites could be sold in 20 years or at a rate of 550 a year. That rate had never been reached, but was evidently based on the sales rate at Sioux Falls where he kept two men selling steadily and the sales campaign in Rapid City had been conducted only from three to six months a year rather than selling steadily the full year. The average sale price of a grave space over the last ten years was $92.67.

There was some evidence of the amount needed to improve the tract east of Highway 16 to make it suitable for burial sites. Largely on Powers' evidence and assumptions of sales of 550 a year, it was computed, shown in evidence to the jury and is argued the balance of the lots on the west side would be sold out in 8 2/3 years and those on the east side over the succeeding 11 1/3 years; thus completing a 20 year sales timetable. The jury verdict allowed $26,500 for the land taken east of the highway and $48,000 additional as severance damages to the west tract.

Value of Land Taken
East of Highway 16

Defendants' opening statement, their evidence, contentions in the trial court and in this court as to the 7.46 acres of land taken are now outlined. Assuming the east tract is dedicated to be and is to be treated by the platting as part of the cemetery and as lots thereof, they start with $92.67 as an average burial space selling price; they then deduct (by interesting and involved formulae covering nearly three printed pages of their brief) $82.95 per lot. The latter includes a 30% sales cost, improvements, administration and maintenance of the cemetery spread over all 13,689 graves for 20 years and, as 2,670 have been sold, over 11,011 unsold graves for perpetual care. The remainder of net value on a per lot basis is $9.72 multiplied by 6,248 or $60,730, the present value of which to be received over a 20 year period at 3½% is $43,227. They contended in the trial court and repeat here the market value rule does not apply to "cemetery property" and introduced evidence in support of their theory, in part set out above. The trial court concurred and the correctness of rulings on admission of evidence, motions to strike, the giving and refusing of instructions to the jury are before the court on this appeal. That the problem first presented to this court is a vexing one appears from the different opinions and results reached by courts which have had occasion to consider it. See annotation in 62 A.L.R.2d 1175. We will first state basic and general principles of law and their application to the facts and later refer to the subject of the annotation.

I. The "just compensation" (Art. VI, § 13, S. D. Constitution) to which an owner of property taken for public use is entitled is the full market value at the time of taking. Market value in turn is the highest price for which property considered at its best and most profitable use can be sold in the open market by a willing seller to a willing buyer neither acting under compulsion and both exercising reasonable judgement. City of Huron v. Jelgerhuis, 77 S. D. 600, 97 N.W.2d 314, and Chicago, M. & St. P. Ry. Co. v. Mason, 23 S. D. 564, 122 N.W. 601. The market value guide line has been uniformly adhered to by the court. They are set forth in the instructions given in State Highway

Commission v. Fortune, 77 S. D. 302, 316, 91 N.W.2d 675, 684, where they were approved except for use of the term "entire tract" to include land separately owned by two defendants and government permit land. Here the 7.46 acres taken east of Highway 16 had not been platted before the cemetery was notified it was to be condemned for a new highway; only then was it platted on paper. No physical improvement to, or change was made, on the tract. In State by Lord v. Malecker, 265 Minn. 1, 120 N.W.2d 36, where the property was platted and roads had been graded and graveled but no improvements were on the land and no sales had been made, the court subscribed to the view expressed in an Illinois opinion with which we agree that " 'the platting of (real estate) does not, without more, alter the value of such property.' " The measure of compensation is not mathematically the aggregate of prices of lots into which it can be, or has been divided on paper, as that is too uncertain and conjectural. Nichols on Eminent Domain, § 12.3142(1); Arkansas State Highway Commission v. Watkins, 229 Ark. 27, 313 S.W.2d 86; Currie v. Waverly & N. Y. Bay R. R. Co., 52 N.J.L. 381, 20 A. 56, 19 Am.St.Rep. 452, 456; Northern Indiana P. S. Co. v. McCoy, 239 Ind. 301, 157 N.E.2d 181. The highest and best use does not require fixed computations and formulae. A reading of the opinions of courts which apparently permit projection of future sales of property not platted into lots or not saleable in the ordinary course of events within a reasonable time indicates the soundness of the reasoning of the Supreme Court of Minnesota in State by Lord v. Malecker, supra. After reviewing several cases it wrote:

> "The court admonished the jury to consider only a single buyer in arriving at market value, stating that market value 'does not mean what the individual lots would sell for to numerous individual buyers.' We think that the court's ruling and charge were correct and that to hold otherwise would open the door to unlimited vagaries, speculation, and conjecture, of a kind we have consistently condemned. Market value is not to be determined by a myriad of separate transactions where there are numerous buyers negotiating for the purchase

> of individual lots over a long period of time. What we are concerned with is the price which an individual purchaser would pay for the entire tract in a single transaction, without concerning the jury with all of the uncertain costs of advertising, brokers' commissions, taxes, utilities, grading, and improvements which a protracted lot-by-lot sales campaign would inevitably require."

See State Highway Commission v. Triangle Development Co., Wyo., 369 P.2d 864, where market value of land platted into lots was valued as a whole. Under this rule the owners receive damages to property in its condition and value at the time of condemnation and restores "them to as good a position as they were in prior to the taking". State Highway Commission v. Fortune, supra; Nichols on Eminent Domain, § 12.1(4), p. 38. That one is a plat of town lots and the other is a plat of cemetery lots does not call for a different result.

Here the court instructed the jury as follows:

## "INSTRUCTION NO. 5

"In arriving at the amount of damages to be awarded to the defendants for the land taken you will first find from the evidence the gross value of each burial lot taken by the State. This you will do by determining the fair and reasonable sale price per lot in the adjoining used portion of the cemetery. This will give you the gross value of each lot so taken. You will then deduct from the gross burial lot value the reasonable cost of development, sales, maintenance, perpetual care, and other expenses affecting its value as you may find the same from the evidence. This will give you the net value of each lot so taken.

"You will then multiply the said net value of each lot by the number of lots which are being taken. This amount represents the net amount which the cemetery would receive resulting from sales which would take

place in the future. You must then compute the present worth of these deferred future sales. Present worth is defined as such sum of money in hand as with a proper rate of interest, compounded will yield the sum to be obtained at the conclusion of the periods in contemplation. In other words, compensation to the defendant must be reckoned and awarded from the standpoint of what the land owner loses by the taking."

In effect it directed the jury to find the gross value of each burial lot in the east tract the same as they found the sale price of a lot in the earlier platted and improved west tract and by mathematical computation find the net value of each lot and its present worth rather than the market value of the east tract as a whole. Some of the opinions do not disclose whether the court was discussing admissibility of evidence other than market value or the court's instruction stating that as the measure of damages. This distinction is mentioned by one text, Orgel on Valuation under Eminent Domain, § 46, where recognizing the general market value rule, etc. he points out there may be a difference between market price and the owner's valuation for his own purposes yet this "does not impel the courts to abandon market value as the verbal rule of compensation. But most courts (admit) evidence of the special aptitudes of the property to its owner that would hardly be admissible if the real object of the trial were simply to secure the best possible guess as to the price at which the owner might have sold his property".

Amoskeag-Lawrence Mills, Inc. v. State, 101 N.H. 392, 144 A.2d 221, involved taking of land and a building said to be an integral part of a large textile manufacturing plant. It appears the trial court permitted the witnesses to use various methods in arriving at values yet instructed the jury "the test was market value 'and not any one of these other methods' ". On appeal the owner complained this overemphasized fair market value with the implication that comparative sales furnished the only test, contrary to the owner's theory that when property is unique and seldom exchanged it has no market price and other means must be resorted to in ascertaining value. The court wrote:

"The law was correctly stated　＊　＊　＊

"It is urged that modern textbook writers supported by some authorities state that in cases where property is unique and seldom bought and sold and market value is impossible of ascertainment by the usual orthodox test, market value is not the measure of compensation. Regardless of whether the property is unique in character and market value difficult of ascertainment, it is generally based upon a hypothetical situation and it is never required that there should in fact have been a person able and willing to buy. 4 Nichols, Eminent Domain, par. 12:32, p. 134. While it is well settled that it is the owner's loss and not the gain to the condemnor which is the measure of damages, not all of the losses suffered by the owner are compensable. He is allowed the fair market value but the Constitution does not guarantee him a return on his investment.　＊　＊　＊　Regardless of the type of property taken fair market value is still the standard to be applied which means the value of the property at the time of the taking, considering among other things the highest and most profitable use for which it was adapted and needed, or likely to be needed in the near future. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704,　78 L.Ed. 1236."

Other courts have arrived at varying conclusions when met by the application of these standards. The particular circumstances present in the cases may account to some extent to the divergence of the opinions as the note in 62 A.L.R.2d 1175 states. A chart in appellant's brief attempts to illustrate them. Without pointing out all the differences that exist in the opinions, some of them, as well as their agreement with our conclusions in part, are reviewed.

Graceland Park Cemetery Company v. City of Omaha, 173 Neb. 608,　114 N.W.2d 29, in reviewing a judgment for the stockholder owned cemetery based on number of grave sites taken multiplied by sale price was held speculative when no deductions were made to arrive at a net value, but approved a unit rule and

not the market value measure of damages. It cited the New York St. Agnes opinion and two First Circuit Court of Appeals' decisions hereafter noted. It rejected "future paper profits" as a guide and approved value based on "current profits" on **sales** reasonably projected over a term of years.

In the cited Cementerio Buxeda, Inc. v. People of Puerto Rico, 1 Cir., 196 F.2d 177, opinion the front and most valuable part of the cemetery was taken; the court held evidence of the actual market value of the land for cemetery purposes and lots for grave sites was wrongfully excluded, stating this "rejected the test of judging market value" (thus recognizing that as the measures of damages), that such evidence seeks to establish " 'what a willing buyer would pay in cash to a willing seller' ", that the inquiry would encompass facts as to **past sales,** future prospects and other evidence as bearing on the valuation of the parcel and "the price a willing buyer would pay". The opinion indicates two differences from the case at bar; there the court stated the income was not such as the skill of the management was important; here the skill is all important for where sales efforts by management were aggressive, sales flourished; when the efforts lagged, sales dropped to a nominal figure. With reference to sales affecting a prospective purchaser, the court wrote: "This is not to say that valuing the parcel is merely a problem in multiplication". It then referred to the caution in United States v. Iriarte, 1 Cir., 166 F. 2d 800, 804, that the question was the value of the land **before** subdivision into lots, not afterward, where in the case at bar the jury was instructed to consider it as divided and sold as lots. Likewise the Circuit Court of Appeals warned that exhibits showing planned development, even if it appears the likelihood of the property for such purpose is such to affect market value, should be received with caution. See also State by Lord v. Kohler, 268 Minn. 77, 128 N.W.2d 90. St. Agnes Cemetery v. State, 1957, 3 N.Y.2d 37, 163 N.Y.S.2d 655, 143 N.E.2d 377, 62 A.L.R.2d 1161, held the "market value 'based on the most advantageous use' " to be the criterion; the later cases (Mount Hope Cemetery Ass'n. v. State, 1960, 11 A.D.2d 303, 203 N.Y.S.2d 415, and Diocese of Buffalo, N.Y. v. State, 1964, 43 Misc.2d 337, 250 N.Y.S.2d 961) accept that as the stan-

dard, though the evidence admitted and considered in those cases included income from the sale of lots. The evidence admitted in St. Agnes varied from $26,000 damages on a market value basis by the state and $327,000 damages by the cemetery. It was on this variance and the Court of Claims' decision that three judges dissented. Van Voorhis, J., for the minority, wrote:

> "These enormous discrepancies call for careful examination. The State contends that the claimant's witnesses used an erroneous method in that they simply capitalized prospective profits  *  *
>
> "The trial court justified this method of valuation by reference to the standard of 'what a willing buyer would pay in cash to a willing seller.' It is quite clear, however, that far from being what a willing buyer would pay in cash to a willing seller, the award is rather the maximum amount which under any circumstances and by the widest stretch of the imagination could be derived from the projected sale of burial lots out of this 13.939 acres. It seems most unlikely that a purchaser could be induced to pay such maximum amount."

Much of the dissent that follows applies to the facts in the case at bar. The Diocese award was based on the average "number of graves which have been sold per year  *  *  *  divided into the number of grave sites unsold".

The St. Agnes opinion also stresses the award was based on "actual sales" indicating the past history of actual sales must be the basis used. The complexities of adopting the St. Agnes New York evidence rule of projecting sales (earnings or profits) into the distant future, is stated in the later Mount Hope opinion: "All such economic projections into the future are speculative, but some practical solution must be found". Examination of the mass of figures and projections into the future from 55 to 138 years confirms this speculative phrase. Using only one of these speculative bases is illustrative: In St. Agnes the approved award was based on an annual earning rate of 2%; current rates of

long term U. S. Government and other conservative bonds are from 4 1/2% to 5 1/2%. At the 40 year cemetery life as found by the court for sale of all remaining lots, the developed portion would be sold out in 22 plus years and the undeveloped portion (where land was taken) in the 17 years thereafter. Computing the projection of the $209,000 award for 22 years on the 2% rate totals $323,114, while on the 5% rate it totals $611,325. Completing this computation over the remaining 17 years sales term at the two different rates would proportionately expand these totals! The expert's testimony here was on a 3 1/2% basis (we have no clue as to the jury finding); yet it indicates the morass into which the projecting of lot sales into the future leads and attempting to discount them to a present value. It may account for the appellate court in Mount Hope reducing the Court of Claims' award from $763,732.16 to $489,322.60.

State v. Lincoln Memory Gardens, Inc., 242 Ind. 206, 177 N.E.2d 655, appears to follow the St. Agnes opinion though the property taken included 63 platted lots which had been sold as burial sites. Evidence of the asking price of similar property was excluded in accord with the general rule as to such evidence, the court adding a witness may state the "cost of a particular property * * * to establish the value of a similar property" and such evidence may be considered by the trier of fact.

Laureldale Cemetery Co. v. Reading Co., 1931, 303 Pa. 315, 154 A. 372, presented the question of valuation of a strip taken from the northern half of the cemetery. $92,000 had been spent in developing it, 1,200 lots had been sold, but no interment had been made within 600 feet of the property taken nor had that part been platted. The trial court refused, as conjectural, to permit the cemetery president to testify to the value of the property on a burial site basis to be sold over 30 years or a present value with each year's sales over the cemetery life, after deducting the cost of development of the entire cemetery according to the universal experience of cemeteries and the Laureldale Cemetery. The resulting figure was $26,000 an acre though it cost $500 a few years before; the court wrote, "this prima facie looked like real estate alchemy. A study of the pro-

cesses by which this result was reached confirms this prima facie impression." Later the court said:

"If in determining the value of part of a cemetery plot condemned under eminent domain a choice must be made between the market value of the land in that vicinity and conjectural value based on discounted future profits, there can be no doubt which choice justice dictates. The size of the verdict appealed from [$39,906.16 for 8 1/4A.] compared with the size of the appellant's demand [$214,500] for compensation for land which cost appellant only $500 an acre [total cost $4,125] three years previously clearly indicates which rule more nearly guarantees 'just compensation.' "

This reasoning persuades us of its soundness and conclusions. See also Green Acres Memorial Park, Inc. v. Mississippi State Highway Commission, 246 Miss. 855, 153 So.2d 286; Van Voorhis, J., dissenting in St. Agnes Cemetery v. State, supra.

■ To justify departing from the general rule of damages the property owner has the burden of showing that it is impossible to prove the value of the property without dispensing with the usual rule. Tigar v. Mystic River Bridge Authority, 329 Mass. 514, 109 N.E.2d 148, and cases cited; Van Voorhis, J., dissent St. Agnes Cemetery v. State, supra.

As SDC 11.1907 grants power of condemnation to cemetery corporations the State offered to prove there was a tract of land of same or larger size as that taken immediately adjacent to the west tract which was available and could be easily used in conjunction with it. There is much to be said for this standard of proof of valuation; indeed, in Re. Brantford Golf and Country Club, 32 Ont.L.R. 141, cited in Orgel § 40, the court awarded the estimated cost of acquiring an adjacent 15 acres to replace the land taken from a golf course plus the cost of rearranging and reconstructing it. The evidence here shows the land to the south to be of similar terrain and on the same side of Highway 16. It may be unusual in the Brantford case such adjacent land was, and in the case at bar is, available for replacement of the

tract taken. Replacement of it with the added cost, if any, of preparing it for cemetery purposes over that of the tract east of Highway 16 will "restore them. (defendants) to as good a position as they were in prior to the taking". State Highway Commission v. Fortune, supra. The market value of this adjacent tract of similar terrain and added costs, if any, were admissible not necessarily on the theory of replacement, but on the issue of the market value of the land taken east of the highway. Green Acres Memorial Park, Inc. v. Mississippi State Highway Commission, 246 Miss. 855, 153 So.2d 286, 290.

■ ■ Evidence of the market value of the east tract and similar land should have been admitted in evidence and it was prejudicial error to deny those offers. The court also erred in giving Instruction No. 5 and refusing to give the market value instruction requested, no such instruction having been given.

■ II. That conclusion is compelled for another reason. Market value does not mean speculative or remote value, 29A C.J.S. Eminent Domain § 137 p. 571, nor one affected either by sentimental or adverse elements. Popwell v. Shelby County, 272 Ala. 287, 130 So.2d 170, 87 A.L.R.2d 1148; Nichols on Eminent Domain, 3rd Ed., § 12.2. While it is the value at the time of the condemnation this court in the Mason opinion approved an instruction that the jury could allow market value for any and all uses the land might be put in view and in the light of present business conditions and those that might be reasonably expected in the immediate future. Chicago, M. & St. P. Ry. Co. v. Mason, 23 S.D. 564, 122 N.W. 601. This time element also applies to the proposed use of the property which must be within a reasonable time. Chandler v. Hjelle, 1964, N.D., 126 N.W.2d 141, 148; Lustine v. State, 217 Md. 274, 142 A.2d 566; State Highway Commission v. Brown, 176 Miss. 23, 168 So. 277; Currie v. Waverly & N.Y. Bay R.R. Co., 52 N.J.L. 381, 20 A. 56, 19 Am.St.Rep. 452; Arkansas State Highway Commission v. Watkins, 229 Ark. 27, 313 S.W.2d 86 quoting United States v. 620.00 Acres of Land, D.C., 101 F.Supp. 686; Northern Natural Gas Co. v. Johnson, Tex.Civ.App., 278 S.W.2d 410; United States v. State of South Dakota, 8 Cir., 329 F.2d 665

(cert. den., 379 U.S. 900, 85 S.Ct. 187, 13 L.Ed.2d 175); 18 Am.Jur., Eminent Domain, § 244 and Orgel on Valuation under Eminent Domain, § 29, note 113, § 31, notes 138, 140.

In the Lustine opinion, the Maryland court said it had earlier held consideration could be given to any purpose to which the property was adapted and for which it was "immediately" available and later in State Roads Commission of Maryland v. Warriner, 211 Md. 480, 128 A.2d 248, the phrase "reasonable" time had been used. As the land in Lustine was condemned while subject to a lease permitting removal of gravel for three years (the property to be left graded for subdivision) it would not be "immediately available", in a dictionary sense, for that purpose, but a prospective purchaser would doubtless take into consideration the use it could be put in the near future and a jury might take into consideration in determining the present market value, the effect upon such value of the reasonable probability of such use "within a reasonable time." In Currie, the New Jersey court limited the present value on use in the immediate present or the "near" future. This appears to be the general criterion. 18 Am.Jur., Eminent Domain, § 244; 29A C.J.S. Eminent Domain § 160. The Mississippi court in State Highway Commission v. Brown, supra, stated:

"it must appear that there is some probability that the land will be used for such purpose within a reasonable time. The fact that a manufacturing plant might be established * * * within twenty years would add but little intrinsic present, determinate, market value to the land, whereas the probability that such plant might be established thereon within a year or two would add materially to the present market value thereof".

People v. Ocean Shore Railroad, Inc., 32 Cal.2d 406, 196 P.2d 570, 6 A.L.R.2d 1179, concurs by stating if the property is adaptable and needed or likely to be needed in the reasonably near future the proposed use is to be considered, not as the measure of value, but to the extent the prospect of such use affects the market value.

■ With 4,771 lots available for sale in the originally platted west tract where the terrain needs no further preparation, where roads, chapel, caretaker's home and the water system are built, installed and located, the historical average of lot sales of less than 100 burial sites a year will require over 47 years before the east tract is needed. Cf. Board of Water Com'rs of St. Paul v. Roselawn Cemetery, 138 Minn. 458, 165 N.W. 279. Opinion evidence it can be sold at an average rate of 550 a year which had never been reached cannot stand against the undisputed 28 year history and sale record. Diocese of Buffalo, N. Y. v. State, 43 Misc.2d 337, 250 N.Y.S. 961, and other New York cases cited above. This opinion evidence of future sales was speculative and inadmissible. Chandler v. Hjelle, supra. The court in Chicago, M. & St. P. Ry. Co. v. Mason, supra, held an estimate of number of cubic yards of sand then on the land to be speculation only and no true rule as to the value. See State Highway Commission v. Triangle Development Co., Wyo., 369 P.2d 864, 869.

SDC 1960 Supp. 11.1906 authorizes cemeteries to hold 160 acres and to sell such part as its governing body may determine is not needed for cemetery purposes within 20 years. It is clear that ownership may include property where future use for cemetery purposes cannot be reasonably anticipated, Board of Water Com'rs of St. Paul v. Roselawn Cemetery, 138 Minn. 458, 165 N.W. 279, and a court in an action properly before it may so conclude, C. A. Wagner Const. Co. v. City of Sioux Falls, 71 S.D. 587, 27 N.W.2d 916, as it must also determine from the facts whether such use will be within a reasonable time. That not appearing evidence of, and the instruction to fix, value lot by lot as to the east tract was erroneous.

■ III. A new trial being required, it is proper to announce our views on other matters complained of which are likely to arise on retrial. Henrichs v. Inter City Bus Lines, 79 S.D. 267, 111 N.W.2d 327. If on retrial, the State is able to make the proof offered of the availability and market value of adjacent land, that value and added expense mentioned, if any, will be the whole measure of damages as it will equal the market value of what defendants lose. Having been restored to their former

position, they will have the added land to replat and sell with perpetual care and all concomitant items of income and disbursements. In that event severance damages to the west tract do not occur.

IV. In the event such proof is not made, the severance damages question will arise and should be mentioned. The only severance damage to the west tract is the claimed loss of contributions to the perpetual care fund from east tract lots and is summarized by defendants in their brief as follows:

BEFORE TAKING:

An annual care cost of $11,900 will need $340,000 invested at 3 1/2%, less the $12,400 on hand, requires $327,600 additional. This could be obtained by a $29.73 charge from each of the 11,019 remaining sites of both tracts.

AFTER TAKING:

An annual care cost of $10,800 will need $308,571 invested at 3 1/2%, less the $12,400 on hand, requires $296,171 additional. This could be obtained by a $62.09 charge from each of the 4,771 west tract remaining sites, an added burden of $32.36 on each remaining site, resulting in a claimed severance damage of $154,389.56.

The present value of this sum received annually was read into the record over several time periods of from 20 to 60 years. No figures were given for longer periods. In accord with our conclusion the actual sales made in the past are the only sound and reliable guide to the future. The **time** period for sale of the 4,771 remaining west tract lots at 100 a year is 47 plus years, and that discounted amount should be submitted to the jury as a basis for their consideration. Whether the 3 1/2% or a higher earning or discount rate is to be submitted may well be left to the record at the new trial.

The **amount** of charge to be taken from lot sales for the perpetual care fund is also pertinent. Our law states cemetery

corporations have power to establish a perpetual care fund. They are neither required to do so nor to set aside for that purpose any amount or percentage of income. SDC 11.1909. SDC 11.1910 does require the proceeds of the sale of lots after deducting certain expenses to be exclusively applied and used in preserving, improving and care of the cemetery, graves and monuments and the expenses of the corporation, and they must not be used for any "profit to the corporation or its members".

The Cemetery Rules and Regulations permitted it or a third trustee to handle the fund; that perpetual care be limited absolutely to the income received from the investment of this fund. The cost of this care was stated to be $11,900 annually for all 13,689 lots and $10,800 for the 7,441 west tract lots. The care provided for in the Rules is limited to the reasonable cutting of grass, raking and cleaning of plots and general preservation of the grounds. However, defendants (W. G. Lacey's successors) have no legal interest in this fund. The only person obligated to care for the property is the Cemetery Corporation under its Rules, and its rights and obligations to Laceys are not here for determination. The defendant Cemetery Corporation alone could plat the lots, operate the cemetery and be damaged as such. The other defendants sold the land as unplatted land, not as burial sites.

With reference to defendant Cemetery Corporation, the present Trustee's books show $12,348.01 in the fund, the figure counsel used and this opinion has followed in the calculations above. This included some interest. The total of principal deposits solely, appears to be $10,833.54, commencing with an "Initial Deposit" of $5,664.22 on March 28, 1957. The origin of this initial deposit was not shown. Witness Powers testified to the need for $340,000 in the perpetual care fund to be created by a deduction from each lot sale. From prediction and projection to the record it appears the cemetery only has deducted and deposited in this fund $10,833.54 from the sale of 2,670 lots or $4.06 a lot. Using the past acts and deductions on a basis (in accord with the reasoning accepting past sales) this fund for the 13,689 lots would total $55,577; less the $10,833 on hand leaves $44,744 as the maximum amount the fund would have

raised based upon the Cemetery Corporation's own acts and records. The owner is to be restored to as good a position as he was before the taking, State Highway Commission v. Fortune, supra; restoration is not to add money or resources not in the planning and acts of the owner judged by the best standard—the past record.

Permitting evidence of and submitting to the jury as severance damages a possible fund requirement of $340,000 was not sustained by the record, was speculative and erroneous. The evidence should have been limited to a maximum fund balance of $44,744 to be created over a period of 47 years on the basis of past sales and reduced to a present worth on such discount rate as may be proper in view of conditions at time of retrial.

The judgment appealed from is reversed.

RENTTO, P. J., and HANSON, J., concur in the opinion.

ROBERTS and HOMEYER, JJ., concur in reversal of the judgment.