Howard T. Hogan, J.
The City of Glen Cove in connection with its urban renewal program on October 1, 1965 vested title to certain property situate at the northwest corner of Shore Road and Glen Cove Avenue. These premises were used by claimant in the conduct of his wholesale-retail plumbing supply business. At the time of vesting it had several uses: (1) storage yard for plumbing supplies, (2) two small apartments, (3) office, shop, interior storage and display sales area for plumbing supplies, and (4) small plot of ground with underground gasoline tanks and pumps with a gasoline service station permit. The property had belonged to claimant and his family since 1931 and used continuously since that date for the plumbing business. Over the years substantial improvements were made in the furtherance of claimant’s business.
Claimant strenuously contends that the subject property, used continuously as it has been with its other diversified uses, should be valued as a “ specialty ”. In support of his position he maintains there are no comparable buildings of this type, citing Matter of City of New York (Kramer Realty) (16 A D 2d 148). It is the court’s view that the facts in this case are readily distinguishable. In Kramer Realty (supra) the claimant was engaged in the manufacture of large formica panels which necessitated a major structural change. Hence, reconstruction cost was the only feasible method to value the improvement. That is not the evidence in this situation. .Some structural changes were made, but none so major that the subject improvements became “ unique ” as that term has been defined by the courts. (Matter of City of New York [Kramer Realty], supra; Matter of City of New York [Madison Houses], 17 A D 2d 317; Matter of City of New York [De Nigris Realty], 20 A D 2d 42.)
The test is whether the character of the property is such as not to be susceptible to the commonly accepted methods of determining fair market value. (Albany Country Club v. State of New York, 37 Misc 2d 134, mod. 19 A D 2d 199, affd. 13 N Y 2d 1085; Central School Dist. No. 1 v. State of New York, 46 Misc 2d 1072, affd. 28 A D 2d 1062.)
*714 There are, of course, certain properties which fall into this category, such as churches, schools and clubhouses, which are referred to as “ specialty properties ”. By that it is meant there is actually no true market value for them in the generally accepted sense in that no others in the area would be interested in acquiring such property. (Diocese of Buffalo v. State of New York, 43 Misc 2d 337, mod. 23 A D 2d 958, affd. 18 N Y 2d 41.)
The testimony reveals that claimant’s experts conceded others could use the building if claimant were to vacate — for example, for electrical supplies. Moreover, it further appears that the warehousing of the plumbing supplies and yard storage facilities have wide-ranging commercial utility. (Matter of Port of New York Auth. [World Trade Center], N. Y. L. J., Feb. 24, 1970, p. 2, col. 2; see McMichael, Appraising Manual, ch. 28, pp. 394-408.) The evidence is not persuasive that this improvement, owner-occupied as it was, contained such unusual features that other businesses requiring storage and handling of supplies and materials for wholesale and retail trade could not make use thereof.
Because of this, the court holds that this improvement was not a “specialty”. Hence, the reproduction less depreciation method of determining value of the improvements is inapplicable.
This in no way detracts from the very comprehensive and detailed analysis made by claimant’s building expert. Claimant’s other expert was a real estate appraiser long recognized by the courts as thoroughly competent. In his approach to value, Mr. Baker utilized two methods: (1) the cost approach which consisted of determining the land value by market data and adding the sound value of the building and yard improvements; (2) the capitalization or income approach. In this latter method he estimated the fair rental value of the entire premises by computing the square-foot area and allocated to the various areas his estimated rent. He then added the fair rental value for the two apartments and of the area which had a gasoline station permit but which was only used by claimant in the furtherance of his own business. However, the area in which the gasoline storage tanks were located ceased to be used as a gasoline service station in 1951 except by the claimant in his business. By reason thereof the court rejects the value found therefor as though it were a going service station and allocates a reduced value for the permit “itself” is a valued asset. The size of that portion of the property available for gasoline station purposes was but 3,808 square feet of a total area of *715 11,703 square feet. The improvements consisted of a detached one and one-half story frame-stucco building, face brick front with basement. To the side of the building was a wood frame loading dock. On the first floor was a sales room, storage area in adjacent two-story apartment building, office, with additional storage areas. The yard was enclosed on three sides with wire fence on posts set in concrete. The condition of the improvements was appraised as “ fair ”.
Since the court is considering only the income or capitalization approach to determine value, it will limit its review to both experts’ methods in that regard.
Petitioner’s expert was decidedly hampered, not having had opportunity to view the property until almost three years after vesting, at which time much vandalism had occurred. He estimated net income to be $6,935, without allocating anything for the gasoline station permit or operation. He relied principally on his comparables Nos. 2 and 3 for this rental value. Comparable No. 2 was a factory. The data for comparable No. 3 was questionable. He allowed an increment of 6% per year, which is minimal, because the area was depressed. His com-parables 4, 5 and 7 gave him an indicated land value of $2.00 per square foot, allocating to sale No. 4 an adjustment of minus 40% by reason of its superior location. Comparable No. 5 sold at $1.55 per square foot. This he adjusted downward 20% for location and 5% for size, but, because this land was below grade, he added 20%, plus 10% for demolition of foundations, resulting in a final adjustment showing an indicated value of $1.71 per square foot. His sale No. 7 in a better location he adjusted by 35%, then deducted 50% for area, shape, topography and time, resulting in a final adjusted value of $2.01 per square foot. Sale No. 6 he did not use because it was rear land. On cross-examination it developed that sale No. 4 was vacant and was not an “ arm’s length transaction ”, having been bought at auction. Sale No. 5 was six feet below grade at Glen Street, as was sale No. 7.
This court finds his adjustments for fill were inadequate, based on claimant’s testimony as to his familiarity with petitioner’s sales. At the time of the sale of comparable No. 7 in May, 1961, the building was vacant, as was sale No. 5 which was low and had a water condition. Comparable No. 3 was also vacant, as was sale No. 1. The proof does not indicate that petitioner’s expert possessed detailed data on sales or rentals in the area, nor does it reflect the value of yard storage. While the court is in accord with his finding that the portion of the premises used by the claimant for gas and oil for his own *716 business could not be valued as though it were a going gasoline service station, nevertheless, it was used for that purpose by claimant in his business. He agreed with claimant’s expert on the operating expenses of $2,352, which was less than his own. Both appraisers used the same over-all capitalization rate of 11% but differed on the allocation to land and building. Petitioner’s estimated income of $7,300 gave an indicated value of $48,000, using a gross income multiplier of 6.6%. This is a valid approach if the estimated income is based upon reliable comparables. He failed to adjust his comparables for the effect of the threat of urban renewal, nor did he consider any resales within a year or two after vesting. Accurate knowledge of real estate values and conditions in a given locality are imperative for a proper analysis. Petitioner’s final estimate of value was $50,150 based upon the income method.
The court finds that claimant’s expert was also hard pressed to find income figures from any comparable properties to establish value by the income or capitalization approach. He said he obtained his data on comparable rentals by ‘‘ talking to people ’ ’ whom he knew. He used his income approach merely as a test. By his income approach he arrived at a value of $109,300, allocating $4,200 per year to the gas station area. While the permit is of value, the area does not support this estimate, nor is there other proof to sustain it. All of this then leaves the court with but little to establish value by capitalization, namely, the actual income from the two apartments totaling $1,260 per year, which was included in petitioner’s estimated income based on his comparables Nos. 2 and 3, plus the allocation of a reasonable factor for the gasoline service area. Although there was no evidence of vacancy, both experts allocated 5%, which is proper in an estimate.
The court adopts claimant’s sales, all of vacant land, used to establish land value. His sale No. 2, opposite the subject property, he adjusted by decreasing it for size and shape although it has a larger area. In comparing it with the subject property, the latter has two rights of way with an additional gore area in the rear. This sold for $1.94 per square foot within 10 days of the date of vesting. His sales reflect a range from $1.94 to $4.24 per square foot. ¡Sales Nos. 1 and 2 he found to equal in point of time and location but inferior in area and shape. His sale No. 3 was inferior in time but superior in location. By his adjustments he arrived at a land value of $3.80 per square foot or $41,800.
Accordingly, the court finds that claimant’s land sales are more reliable, and adjusts these for time, location and area, *717 arriving at a square-foot value of $3. It adopts petitioner’s estimated income, but adds thereto a reasonable return as found by claimant’s expert for the gasoline service area and finds that a fair return is $1,500 per year, giving a total estimated gross income of $8,800. Allocating a 5% vacancy factor and $1,452 for taxes, $225 for insurance, $250 for repairs and maintenance, leaves a net income of $6,448. Allocating a 7% return to land valued at $33,219 gives an indicated return to land of $2,325, leaving a net return to improvements of $4,123, which, capitalized at 11%, indicates the value of the improvements to be $37,482, or a total for land and improvements of $70,700 as follows:
DAMAGE PABCEL NO. 10-15 :
ESTIMATED GEOSS INCOME
Improvements............... $7,300
Gasoline service area (with permit) ........:____ 1,500
Total $8,800
Vacancy 5%................. $ 425
EXPENSES
Real Estate Taxes............ $ 1,452
Insurance ................... 225
Repairs and Maintenance..... 250 $2,352
Net Income $6,448
LAND
11,073 square feet at
$3.00 per square foot....... $33,219
Income to Land:'
7% X $33,219.............. -$2,325
Net Income to Improvements.. $4,123
Capitalization — 11%
Value of Improvements plus
Land ................... $33,219
Improvements........... $37,482
Total ................... $70,701 rounded to $70,700
Accordingly, the court finds the total award to be $70,700.