#27198-rev & rem-JMK & GAS
**2016 S.D. 88**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,
by and through the Department of
Transportation and the South Dakota
Transportation Commission,         Plaintiffs and Appellants,

    v.

ROBERT L. MILLER and
THOMAS P. WALSH,         Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE SUSAN M. SABERS
Judge

\* \* \* \*

KARLA L. ENGLE
Special Assistant Attorney General
Department of Transportation
  Office of Legal Counsel
Pierre, South Dakota

    and

ANTHONY M. HOHN
Special Assistant Attorney General
Davenport, Evans, Hurwitz
  & Smith, LLP
Sioux Falls, South Dakota         Attorneys for plaintiffs
        and appellants.

\* \* \* \*

           ARGUED ON
           SEPTEMBER 2, 2015
           OPINION FILED **12/07/16**

MARK V. MEIERHENRY
CLINT SARGENT
CHRISTOPHER HEALY of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota

Attorneys for defendants
and appellees.

#27198

KERN and SEVERSON, Justices

[¶1.]     **Justice Kern delivers the opinion of the Court on Issue One, Issue Two, and Issue Three.  Justice Severson delivers the opinion of the Court on Issue Four.**

[¶2.]     **KERN, Justice, writing for the Court on Issue One, Issue Two, and Issue Three.**

[¶3.]     The State reconstructed the interchange at Interstate 90 and Cliff Avenue in Sioux Falls, South Dakota.  Prior to the project, the State instituted a quick-take condemnation action against landowners Robert Miller and Thomas Walsh and effected a partial taking of their real property south of the interchange on-ramp.  Miller and Walsh and the State disputed the amount of compensation due.  After a four-day trial, the jury awarded Miller and Walsh $551,125.  The State appeals.

## BACKGROUND

[¶4.]     In 2012, the State planned to reconstruct part of the South Dakota state trunk highway system pursuant to a federal aid project.  Particular to this appeal is the State's reconstruction of the interchange at Interstate 90 and Cliff Avenue.  Miller and Walsh owned real property 100 feet from the east-bound on-ramp to Interstate 90, namely Lots 5, 6, 7, 8, and 15 of North Side Gardens (the Property).  Lots 5, 6, 7, and 8 are vacant and contiguous.  Lot 15 sits directly across from Lot 6, abutting 63rd Street.  Lot 15 is vacant except for a storage shed in the southwest corner of the lot.  The Property is zoned for commercial use.  None of

these lots abut Cliff Avenue or have direct access to Interstate 90. Direct access to the Property exists via 63rd Street.

[¶5.] Before the public improvement, Miller and Walsh accessed the Property by traveling on Cliff Avenue, turning east onto 63rd Street, and proceeding a short distance to the Property. Prior to the public improvement, 63rd Street was a narrow gravel road that ended approximately 280 feet east of the Property. During the public improvement, the State built a 300-foot asphalt extension connecting 63rd Street with another segment of 63rd Street farther to the east. This extension also connected 63rd Street to National Avenue. National Avenue runs north and south through an industrial park and connects with East 60th Street. Gulby Avenue also runs north and south and intersects with 63rd Street. After the State constructed the extension on 63rd street, it closed the intersection at Cliff Avenue and 63rd Street (the Intersection), cutting off Miller and Walsh's access to the Property from Cliff Avenue. To access the Property, Miller and Walsh now have to come from 60th Street and travel north on National Avenue or north on Gulby Avenue and then turn west on 63rd Street.

[¶6.] To complete the public improvement, the State required a temporary easement and permanent easement over Lots 6, 7, and 8. It also condemned a triangular-shaped piece of land from the northern portion of these lots. The State adopted a resolution declaring the necessity of the taking and instituted a quick-take condemnation action against Miller and Walsh. *See* SDCL ch. 31-19. The State did not dispute the compensability of the taking and deposited $20,100 cash with the Minnehaha County Clerk of Courts. On May 21, 2012, the State filed a

summons, petition, and declaration of taking pursuant to SDCL 31-19-3 and SDCL 31-19-23. Miller and Walsh did not contest the taking under SDCL 21-35-10.1 and requested that a jury determine damages.

[¶7.] Prior to the trial to determine damages, the State moved for partial summary judgment. It asserted that Miller and Walsh did not suffer a compensable taking or damaging to their property due to the closure of the Intersection. The State acknowledged that Miller and Walsh have a right to reasonable access to the streets abutting the Property but claimed that Miller and Walsh's remaining access was reasonable because their access to 63rd Street remained unchanged. Miller and Walsh responded that the closure of the Intersection destroyed the highest and best use of their property and, therefore, significantly reduced its value. They did not assert a special property right in the Intersection. Rather, Miller and Walsh claimed that the State impaired their right of reasonable access to the transportation "grid" when it closed the Intersection.

[¶8.] After a hearing, the circuit court issued an incorporated memorandum decision. It found no issue of material fact in dispute and held that the closure of the Intersection did not effect a compensable taking. The court wrote, "Although [Miller and Walsh] are entitled to severance and consequential damages for the taking of their properties, damages relating to the intersection closure may not be considered by the jury in awarding consequential damages." The court entered an order granting the State partial summary judgment, ruling that "[t]he parties are prohibited from presenting evidence and making arguments to the jury about

damages to Defendants' property as a result of the closure of 63rd Street and Cliff Avenue intersection."

[¶9.] The parties filed additional pretrial motions. Miller and Walsh filed a motion to allow evidence of damage to Lot 15 as part of the property damaged by the taking even though the State did not physically take any portion of Lot 15 and Lot 15 is not connected to Lots 6, 7, or 8. The State filed a motion in limine to prevent Miller and Walsh from presenting evidence "of any kind" relating to "an alleged loss of access to Cliff Avenue" or evidence relating to a "hotel project that Kelly Inns LTD proposed and then abandoned before the date of taking in either of these cases." Prior to the public improvement, Kelly Inns owned Lots 16 and 17. According to Miller and Walsh, Kelly Inns intended to construct a Kelly Inn hotel in conjunction with Miller and Walsh's plan to commercially develop the area. Miller and Walsh argued that the hotel project was relevant to establish the commercial viability of the Property. The State filed a second motion for partial summary judgment to prevent the admission of evidence relating to any loss allegedly suffered by Miller and Walsh because of the impact of the public improvement on property not owned by Miller or Walsh.

[¶10.] The court held a consolidated motions hearing. It granted Miller and Walsh's motion to present evidence of damage to Lot 15 as part of the "larger parcel." It also granted in part the State's second motion for partial summary judgment and ruled that Miller and Walsh "will not be permitted to make a separate and stand-alone claim for the closure of the intersection at 63rd Street North and Cliff Avenue and the [c]ourt will not instruct the jury on such a claim."

It also denied in part the State's second motion for partial summary judgment and ruled that Miller and Walsh "will be permitted to present evidence regarding the depreciation in value of their remaining property by reason of the diversion of travel caused by the taking that occurred, which is a proper factor that may be considered by the jury in determining the highest and best use of the property and its fair market value before and after the taking." The court denied the State's motion in limine to exclude evidence relating to the proposed and then abandoned construction of a Kelly Inn hotel.

[¶11.] A jury trial was held on June 24-27, 2014. Miller and Walsh presented evidence that, in 1990, Miller purchased Lots 18 and 19 with plans to purchase more land and develop the area commercially. In 1999, Miller purchased Lot 17 and in 2000, Lots 2, 3, and 4. In 2004, Miller and others acquired Lot 16, and Miller purchased Lots 5 and 6. Later Miller asked Walsh to join in ownership of Lots 5 and 6. Walsh shared Miller's vision to develop the area commercially. Walsh owned Lot 20, which a Burger King occupied. Miller, via JB Enterprises, Inc., owned a Perkins Restaurant on Lot 19, which lot abutted the Intersection.

[¶12.] Miller and Walsh presented evidence specifically related to the intended construction of a Kelly Inn hotel in North Side Gardens. Over the State's objection, Miller, Walsh, and several other witnesses testified that Kelly Inns did not build the hotel because of the State's public improvement. Miller and Walsh also presented evidence that had the hotel been built the Property would have enjoyed an alternative access over Lot 15 by an easement agreement that Miller and Walsh and Kelly Inns intended to execute. In response, the State emphasized

that no easement in fact existed. The State presented evidence that Miller and Walsh's commercial development plans were in their infancy. Lots 5, 6, 7, and 8 did not have water or sewer service and the Property abutted a narrow dirt road, 63rd Street. The State further asserted that Kelly Inns abandoned its plan to build a hotel in 2010, which, in the State's view, makes the hotel project irrelevant in this case because the date of the "taking" was June 12, 2012.

[¶13.] Over the State's objection, Miller and Walsh presented evidence that the Property diminished in value because the State took a portion of their property to reconstruct the interchange, which public improvement as a whole eliminated the highest and best use of the Property as general commercial. The court permitted the evidence, relying on *Schuler v. Board of Supervisors of Lincoln Township*, 12 S.D. 460, 81 N.W. 890 (1900). In the circuit court's view, *Schuler* stands for the proposition that the jury has a right to consider the diversion of traffic "in determining the question of how much the plaintiffs' lands were depreciated in value by reason of the proposed highway." *See id.* at 460, 81 N.W. at 893.

[¶14.] The court also permitted Dan Mueller, Miller and Walsh's expert, to testify that the State's public improvement impacted the value of Lots 5, 6, 7, 8, and 15 as a whole, even though the State did not physically take any portion of Lot 15. Mueller explained, over the State's objection, that Lot 15 was part of the "larger parcel" making up Miller and Walsh's property, even though Lot 15 was not physically connected to Lots 5, 6, 7, or 8. According to Mueller, the Property satisfied the three elements of the "larger parcel rule": (1) unity of ownership, (2) contiguity, and (3) unity of use. The Property had unity of ownership because it

was owned by Miller and Walsh, had unity of highest and best use because the land is zoned commercial and had tendencies for commercial development, and satisfied the contiguity element because "Lot 15 could be incorporated into a development that would also make use of Lots 5, 6, 7, and 8."

[¶15.]     In regard to the specific value of the Property before the taking, Mueller explained that he did "an appraisal that would consider how the market would view the property absent the project that's going to be occurring[.]" He further explained that although the date of taking was June 12, 2012, the appraisal considered more than "the facts on the ground on June 12[.]" Mueller examined the property as if the market had no knowledge of the State's public improvement. In Mueller's opinion, "[t]he highest and best use in this area would be a generalized commercial use that would be supported by the various attributes that the property had to offer." He testified that he considered Miller and Walsh's intent to develop the area commercially. He noted that he did not give much consideration to the intended construction of the Kelly Inn, except that the plan to construct the Kelly Inn supported the idea that the Property was commercially viable. He identified seven comparable sales. He explained that he valued the Property as a vacant lot considering its roads and the access points. After adjusting the comparable properties in relation to the Property, Mueller valued the Property prior to the State's taking at $6.50 per square foot for a total value of $778,800.

[¶16.]     In valuing the Property after the taking, Mueller testified that he took into account: (1) the decrease in the Property's square footage from the State's physical taking of land, (2) the State's temporary easement, and (3) the change in

the overall access to the Property. He explained that after the public improvement it was "not at all realistic" to think the Property could be developed commercially. In Mueller's opinion, the State's public improvement relegated the highest and best use of the Property from generalized commercial to industrial. He explained that, prior to the taking, there were no industrial improvements separating the Property from Cliff Avenue. "And that's the key point. And in the after situation you now - - now you've reversed the orientation of this land, whereas the front door of this land in the before was a commercial corridor, that's now the back with no access. Now the front door is an industrial park that you must drive through in order to reach it and that's a completely different dynamic." Mueller described that the remaining access to the Property existed through two routes: (1) travel down 61st Street to Wayland Avenue along a "field road"; and (2) travel from 60th Street to National Avenue through an industrial park to the Property. Mueller opined that the changes to access "dramatically" affected the highest and best use of the Property. He further took into account that Kelly Inns sold its property to the State and abandoned its plans to build the hotel. Ultimately, Mueller valued the Property after the taking at $2.05 per square foot for a total value of $239,500.

[¶17.] In response, the State presented expert testimony of commercial real estate appraiser John Schmick that the highest and best use of the Property both before and after the taking was either low-end commercial or high-end industrial. Schmick testified that, contrary to Mueller's opinion, Lot 15 should not be valued as part of the larger parcel because it was not connected to the other lots and has not yet been used for commercial development. When Schmick began to explain his

rationale for that conclusion the circuit court interrupted his testimony. After a short bench conference the court dismissed the jury to discuss the issue on the record with counsel. The court informed the parties that it believed it had entered a pretrial ruling that all three elements of the larger parcel rule had been met and indicated that it interrupted Schmick's testimony because the court was "not inclined to allow a nonlegally trained gentleman to get on the stand and overrule [the court's] legal conclusion from a prior written decision and hearing." The court ruled that Schmick "can testify that factually his determination was that 15 was not part of a larger parcel, and then he can testify as to his valuation, which is his purpose here today." However, Schmick could not "cite the case law. He's not going to instruct the jury that legally it's not part of it."

[¶18.] Schmick valued Lots 5, 6, 7, and 8 at $235,000 before the taking and $211,000 after the taking. For Lot 15, Schmick estimated no value change: $112,000 before and after the taking. According to Schmick, the closure of the Intersection did not affect the value of the Property. He explained, "[Y]ou had a dead-end street before, you've got a dead-end street afterwards. It just comes from a different direction. But zoning hasn't changed. You're still fronting 63rd Street. The uses that are allowed by zoning in the before are still allowed in the after. And in terms of low-end commercial these are going to be more destination-oriented things. You know, being they're not fronting on Cliff they don't need to front on Cliff so those uses can still be there."

[¶19.] At the close of the trial, Miller and Walsh moved for a judgment as a matter of law that Lot 15 be included in the valuation of the parcel. The State

responded that the jury must decide if Lot 15 was part of the larger parcel. The court found that based on its pretrial ruling and based on the evidence presented at trial, "unity of use, unity of ownership and contiguity have been established as a matter of law[.]" The court granted Miller and Walsh's motion.

[¶20.]        During the settling of jury instructions, Miller and Walsh requested that the court modify the pattern jury instruction on the formula for calculating just compensation to use the word "project" instead of "taking" to describe the "before and after" effect of the State's public improvement. Miller and Walsh expressed concern that use of the word "taking" would lead the jury to value only the physical taking of land on Lots 6, 7, and 8. They believed that the use of the word "project" would allow the jury to consider the damage caused to the Property by the State's public improvement as a whole. The State argued that the pattern jury instruction accurately described the law in South Dakota and that other instructions proposed by the circuit court would make it clear to the jury that it could award consequential damages.

[¶21.]        The court modified the instruction to use the word "project" rather than "taking," concluding that "the change is both legally accurate and factually necessary here[.]" Instruction 7 provided:

> The State of South Dakota is taking only part of Defendant landowners' property. The residue of the tract of land remains in Defendant landowners' ownership.
>
> South Dakota uses the "before and after" formula to determine the just compensation to which the owner is entitled in a partial-taking case. Where only a portion of a property is condemned, the measure of just compensation includes both the value of the land actually taken and the value by which the residue, or

remaining parcel, has been diminished, if any, as a consequence of the partial taking.

To determine just compensation, first you must determine the "before value," which is the fair market value of the entire property as of June 12, 2012, immediately before, and unaffected by, *the project*. Then you must determine the "after value," which is the fair market value of the residue, or remaining parcel, as of June 12, 2012, immediately after, and as affected by, *the project*. The difference between the "before value" and "after value" will be the just compensation to which the defendant property owner is entitled and will also be the amount of your verdict.

(Emphasis added.) The jury awarded Miller and Walsh $551,125 in just compensation.

[¶22.]    The State appeals, asserting:

1.    The circuit court erred when it ruled as a matter of law that Lot 15 is part of the larger parcel for purposes of valuation and compensation.

2.    The circuit court abused its discretion when it prevented the State's expert from offering testimony relating to why Lot 15 did not have unity of use with Lots 5, 6, 7, and 8.

3.    The circuit court abused its discretion when it modified the pattern jury instruction to instruct the jury to determine the value of the property before and after "the project" rather than "the taking."

4.    The circuit court abused its discretion when it allowed testimony on how the diversion of traffic to and from Cliff Avenue diminished the value of Miller and Walsh's property.

**STANDARD OF REVIEW**

[¶23.]    Our standard of review of evidentiary rulings is well settled: "This Court reviews a decision to admit or deny evidence under the abuse of discretion standard." *Ferebee v. Hobart*, 2009 S.D. 102, ¶ 12, 776 N.W.2d 58, 62. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and

clearly against reason and evidence." *Mousseau v. Schwartz*, 2008 S.D. 86, ¶ 10, 756 N.W.2d 345, 350 (quoting *Kaiser v. Univ. Physicians Clinic*, 2006 S.D. 95, ¶ 29, 724 N.W.2d 186, 194). As we recently explained in *Magner v. Brinkman*, we review a circuit court's decision to grant or deny a motion for a judgment as a matter of law de novo. 2016 S.D. 50, ¶ 13, 883 N.W.2d 74, 80-81.

## ANALYSIS

[¶24.]     We combine the first two issues. We examine whether the circuit court erred when it ruled as a matter of law that Lot 15 should be included with Lots 5 through 8 as a single unit. We also review whether the court abused its discretion when it prevented the State's expert from explaining why Lot 15 should not be included with Lots 5 through 8 as a single unit to be valued by the jury.

[¶25.]     Prior to trial, the parties disputed whether Lot 15 should be valued with Lots 5 through 8 for purposes of just compensation. Lot 15 is on the other side of 63rd Street and is not connected to Lots 5, 6, 7, or 8. Lot 15 is adjacent to the land upon which Kelly Inns would have built a hotel had the State not undertaken its public improvement. The circuit court granted Miller and Walsh's motion to present evidence that Lot 15 should be included with Lots 5 through 8 as part of a single unit. The court then, sua sponte, prevented the State's expert from testifying that Lot 15 was not part of Lots 5 through 8. At the close of the case, the court granted Miller and Walsh's motion for a judgment as a matter of law that Lot 15 was part of the larger parcel. The court instructed the jury that the parcel to be valued included Lots 5 through 8 and Lot 15.

[¶26.]        In *State Highway Commission v. Fortune*, "[w]e recognize[d] that separate parcels or tracts of land held in one ownership will be considered as contiguous and may constitute one parcel of land within the meaning of the condemnation statutes if the parts are devoted to a single use."  77 S.D. 302, 310, 91 N.W.2d 675, 681 (1958); *State Highway Comm'n v. Bloom*, 77 S.D. 452, 459, 93 N.W.2d 572, 576 (1958).  "[O]rdinarily it is a practical question to be decided by the jury[.]"  *Hurley v. State*, 82 S.D. 156, 164, 143 N.W.2d 722, 727 (1966) (quoting 29A C.J.S. *Eminent Domain* § 140).  "It becomes a question of law only where reasonable minds cannot differ."  4A Julius L. Sackman, *Nichols on Eminent Domain* § 14B.04(1) (3d ed., rel. 110-12/2010).  Factors to consider include (1) unity of title, (2) contiguity of use, and (3) unity of use.  *Fortune*, 77 S.D. at 311, 91 N.W.2d at 681 (citing *City of Menlo Park v. Artino*, 311 P.2d 135, 136 (Cal. Dist. Ct. App. 1957)); *Hurley*, 82 S.D. at 164, 143 N.W.2d at 727.  The presence of each unity is not required, although "[t]he factor most often applied and controlling in determining whether land is a single tract, is unity of use."  4A Sackman, *supra*, § 14B.03(1); *see Hurley*, 82 S.D. at 164, 143 N.W.2d at 727.  "There must be such a connection or relation of adaptation, convenience, and actual and permanent use, as to make the continued ownership of the parcel taken reasonably and substantially necessary to the highest and best use of the remainder parcel."  4A Sackman*, supra*, § 14B.03(1).  We have said that the intent of the owner is relevant, as well as the use and appearance of the land.  *Hurley*, 82 S.D. at 165, 143 N.W.2d at 727 (quoting 4 Julius L. Sackman, *Nichols on Eminent Domain* § 14.31 (3d. ed. 1962)).

[¶27.]    Miller and Walsh recognize that Lot 15 and Lots 5 through 8 are not *currently* being commercially developed.  They emphasize, however, that "unity of use" need not be a current use.  Miller and Walsh submit that the State does not dispute that they intended to use Lots 2, 3, 4, 5, 6, 7, 8, 15, 16, 17, 18, and 19 for the single use of creating a commercial assemblage.  They further contend that they "accomplished [this] commercial assemblage" when they secured an "anchor" tenant—the Kelly Inn hotel.  However, no portion of the Kelly Inn was going to be constructed on Lot 15 or Lots 5 through 8.  Nonetheless, Miller and Walsh submit that Kelly Inns' plan to construct a hotel was made in conjunction with their plan to commercially develop the area, including Lots 15, 5, 6, 7, and 8.  Therefore, in their view, Lot 15 is part of the larger parcel and the hotel project was relevant to establish the commercial viability of the Property.

[¶28.]    The State contends that Miller and Walsh merely "make the vague assertion that these disparate commercial uses constituted a 'commercial assemblage[.]'"  According to the State, Miller and Walsh's "hopes to enjoy the benefits of a nearby hotel project do not establish the single, integrated and inseparable use required by our law."  In the State's view, Miller and Walsh must present specific evidence that the highest and best use of *Lot 15* is in a commercial development *with Lots 5, 6, 7,* and *8.*

[¶29.]    From our review, the circuit court erred when it ruled as a matter of law that Lot 15 is part of the larger parcel.  Miller and Walsh did not establish that Lot 15 would, in the reasonably near future, be put to its highest and best use *in combination with* Lots 5, 6, 7, and 8 for the singular purpose of commercial

development.  Miller and Walsh also did not establish that Lot 15 is necessary to the use and enjoyment of Lots 5, 6, 7, and 8 as an integrated economic unit.  On the contrary, their expert, Mueller, merely testified to the possibility:

> **Q**: What I am asking you is, Lot 15 didn't have to be used as one project with 5, 6, 7, and 8, correct?
>
> **A**: It didn't have to be, but it could.
>
> **Q**: It's possible, but you don't have to use it.
>
> **A**: It's very possible.
>
> . . . .
>
> **Q**: Between 5, 6, 7, 8 and 15, there's not interdependence between those where they have to be used for the same thing.
>
> **A**: They don't have to be, but again it gets back to highest and best use and it might be - - and I think it's very plausible - - that someone could.

Further, the engineer's concept plans devote Lot 15 to an apartment building and Lots 5, 6, 7, and 8 to office buildings.  And Kelly Inns' president testified that Kelly Inns did not plan to purchase Lots 5, 6, 7, and 8 for its hotel project.

[¶30.]        "[T]he presence or absence of unity is such a significant element on which value depends that it should be left to the determination of a trier of fact on a weighing of all the pertinent evidence."  4A Sackman, *supra* ¶ 26, § 14B.04(1).  Because judgment as a matter of law is only appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," the circuit court erred when it granted Miller and Walsh's motion for judgment as a matter of law.  *See Huether v. Mihm Transp. Co.*, 2014 S.D. 93, ¶ 29, 857 N.W.2d 854, 864 (quoting SDCL 15-6-50(a)(1)).  The court also abused its discretion when it prevented the State from presenting evidence to refute Miller

and Walsh's expert's testimony that Lot 15 is part of the larger parcel. The State is entitled to a new trial.

[¶31.]	The State next claims that the circuit court abused its discretion when it instructed the jury to determine the value of Miller and Walsh's property before and after the *project* instead of before and after the *taking*. The State submits that the court's use of the word "project" in Instruction 7 failed to tie the damages to the compensable taking. It argues that with this improper instruction the jury could "award compensation for *any* aspect of the State's project, including non-compensable diversion of traffic." The State further contends that the court's instruction conflicts with Instruction 12 because Instruction 12 informed the jury that Miller and Walsh were not entitled to damages for the closing of the intersection at Cliff Avenue and 63rd Street.

[¶32.]	While circuit courts have broad discretion in instructing the jury, "their instructions must provide a full and correct statement of the law." *Walter v. Fuks*, 2012 S.D. 62, ¶ 16, 820 N.W.2d 761, 766. "[W]e construe jury instructions as a whole to learn if they provided a full and correct statement of the law." *Behrens v. Wedmore*, 2005 S.D. 79, ¶ 37, 698 N.W.2d 555, 570 (quoting *First Premier Bank v. Kolcraft Enters., Inc.*, 2004 S.D. 92, ¶ 40, 686 N.W.2d 430, 448). Error occurs if, as a whole, the instructions misled, conflicted, or caused confusion. *Id.* To constitute reversible error, however, the party challenging the instruction must show that "in all probability it produced some effect upon the verdict" and harmed that party's substantial rights. *Id.*

[¶33.]      Our early eminent domain cases focus on the terms *taken* or *taking* in accordance with the language of our state constitution. *See, e.g.*, *Schuler*, 12 S.D. 460, 81 N.W. 890. By the time of *State Highway Commission v. American Memorial Parks, Inc.*, this Court said that when "property [is] *taken* for public use[,]" the measure of damages is applied according to the highest and best use of the property sold in an open market by a willing seller to a willing buyer. 82 S.D. 231, 236, 144 N.W.2d 25, 27-28 (1966) (emphasis added). We concluded that "[t]he market value guide line has been uniformly adhered to by [this] [C]ourt." *Id.* at 236, 144 N.W.2d at 28.

[¶34.]      The circuit court abused its discretion when it used the word "project" instead of "taking" in Instruction 7. The instruction in all probability misled and confused the jury. We recognize that the court correctly instructed the jury that "the measure of just compensation includes both the value of the land actually taken and the value by which the residue, or remaining parcel, has been diminished, if any, as a consequence of the partial taking." However, the use of the term *project* instead of *taking* in Instruction 7 is an incorrect statement of the law. The former encompasses a wider range of conduct than the latter. It is well settled that the "[t]he measure of damages in condemnation cases involving a partial taking is the difference between the fair market value of the unit before the *taking* and the fair market value of what remains after the *taking*." *State Highway Comm'n v. Hayes Estate*, 82 S.D. 27, 34, 140 N.W.2d 680, 684 (1966) (emphasis added) (citing *City of Bristol v. Horter,* 73 S.D. 398, 43 N.W.2d 543 (1950); *Fortune,*

77 S.D. at 311, 91 N.W.2d at 681). We direct the court on remand to use the word "taking" rather than "project."

[¶35.] We reverse and remand for a new trial consistent with this opinion.

[¶36.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur on Issue One, Issue Two, and Issue Three.

[¶37.] **SEVERSON, Justice, writing for the Court on Issue Four.**

[¶38.] Compensation for loss of access is recoverable in a partial-taking action if the circuit court determines that the State substantially impaired access to a landowner's property.[1] If the State substantially impairs a landowner's access, the landowner may present evidence of the impaired access in establishing the fair market value of the property after the taking. Here, the circuit court did not make the threshold determination whether the State substantially impaired Miller and Walsh's access; therefore, we remand to the circuit court to make a determination whether access has been substantially impaired.[2]

[¶39.] Article VI, § 13, of our Constitution declares that "[p]rivate property shall not be taken for public use, or damaged, without just compensation[.]" "South Dakota's constitution provides greater protection for its citizens than the United

---

1. Miller and Walsh can allege substantial impairment of access either in this action or a separate action for inverse condemnation. The primary distinction is whether the initial action is initiated by the State or the landowner, but with appropriate pleading, both claims may be combined and considered in one action.

2. Our cases have used *materially impaired*, *unreasonably diminished or interfered with*, and *substantially impaired* interchangeably. For consistency, we use *substantially impaired*.

States Constitution because 'our Constitution requires that the government compensate a property owner not only when a taking has occurred, but also when private property has been "damaged."'" *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 9, 827 N.W.2d 55, 60 (quoting *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, ¶ 21, 709 N.W.2d 841, 846). "The measure of damages in condemnation cases involving a partial taking is the difference between the fair market value of the unit before the taking and the fair market value of what remains after the taking." *Hayes Estate*, 82 S.D. at 34, 140 N.W.2d at 684; *see also City of Devils Lake v. Davis*, 480 N.W.2d 720, 725 (N.D. 1992) ("An owner whose property has been taken by condemnation is entitled to the fair market value of property actually taken and to severance or consequential damages for property not taken."). "[W]here no part of an owner's land is taken but because of the taking and use of other property so located as to cause damage to an owner's land, such damage is compensable if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole." *Bloom*, 77 S.D. at 461, 93 N.W.2d at 577.

[¶40.]     In this case, the State took a small triangular piece of property to complete its public improvement, and Miller and Walsh did not show that the taking itself impacted their access in any way. Instead, the circuit court allowed Miller and Walsh to introduce evidence of damage to their access caused by the public improvement as a whole, namely the impairment caused by the closure of the Intersection. Miller and Walsh's property abuts 63rd Street, not Cliff Avenue. Miller and Walsh argue that under *Schuler* they should be compensated for loss resulting from the Intersection's closure—even if the closure did not substantially

impair their access—because the State coincidentally appropriated a small tract of unrelated land.

[¶41.]    To be compensable, a landowner's damage must involve damage to a property interest.  The Supreme Court of California has explained that "[c]ourts throughout the country are in substantial agreement" that the measure of compensation due is the diminution in the fair market value of the property.  *Rose v. State*, 123 P.2d 505, 519 (Cal. 1942).  But "there is a wide variance in the manner of establishing the amount of damage."  *Id.*  The *Rose* court examined cases involving partial takings throughout the country and explained:

> Where there is a taking of private property, . . . the damage to the remainder is nearly always attributed to that taking.  Thus, courts of [some] states have frequently said that the amount of damage, that is, the depreciation in value of the remainder, may be established by testimony relating to any factor, even though noncompensable in itself, which would make the property less desirable in the eyes of a prospective purchaser.  Such factors do not constitute separate elements of damage for the purpose of recovery but are admitted solely for the purpose of establishing the depreciation in market value.

*Id.* at 519-20 (citations omitted).  The *Rose* court continued, explaining that unlike some other states, California does not allow noncompensable factors to be included in damages to the remainder.

> In . . . California, where the recovery of damages depends upon the infringement of some right which the owner of land possesses in connection with his property, decisions have clearly indicated that, although the measure of damages is generally the diminution in market value, the evidence relied upon to establish such diminution must be based upon the depreciation flowing from the actionable injury which is the basis for the right to recover damages.  Thus, in *People v. Gianni*, 130 Cal. App. 584, 20 P.2d 87, a small portion of land was taken for public highway purposes.  It was contended on behalf of the landowner that because a small portion of land had been taken

and because he was entitled to recover for that injury, the damages to his remaining land should be based upon the total depreciation in the value of his remaining property even though that depreciation was caused primarily by an admittedly noncompensable element of damage, that is, diversion of traffic. The court said, however, that while diminution in market value was ordinarily the test of damage to real property, the damages must be limited to those which accrue *by reason of* the legal injury for which compensation was due . . . .

A similar conclusion must also be reached where damage alone is involved. Many courts have indicated that the diminution of value in such cases cannot be based upon elements of damage for which the landowner is not entitled to recover.

*Id.* at 520-21.

[¶42.]	Access is a property interest. In regard to access, we have explained that an abutting landowner has a right of ingress and egress "that pertains, not only to the part of the highway abutting the owner's land, but extends sufficiently beyond his own premises as to insure him reasonable facilities for connection with those highways in which he has no special rights." *Hyde v. Minn., Dak. & Pac. Ry. Co.*, 29 S.D. 220, 238-39, 136 N.W. 92, 99 (1912). However, "the right of ingress and egress . . . [is] subject to reasonable regulations in the public interest and for the promotion of public convenience and necessity." *Darnall v. State*, 79 S.D. 59, 68, 108 N.W.2d 201, 205-06 (1961). "*Where there is no physical taking and the owner's access to the highway on which he abuts is not unreasonably diminished or interfered with,* his loss is due to diversion of traffic, a lawful exercise of the police power and there can be no recovery." *Id.* at 70, 108 N.W.2d at 207 (emphasis added).

[¶43.]	Initially, in any takings case, the determination whether a property interest was taken or damaged for public use is a question of law for the court.

Thus, before a landowner can present evidence of damage to the landowner's access, the circuit court must make a legal determination whether the State substantially impaired the landowner's access, thereby taking or damaging a property interest. *See State ex rel. Dep't of Transp. v. Henrikson*, 1996 S.D. 62, ¶ 9, 548 N.W.2d 806, 809 ("The right of access cannot be taken for public use *or* [*substantially*] *impaired* without just compensation." (emphasis added)). Substantial impairment of access is not the same as diversion of traffic or mere circuity of travel.[3] The difference is a matter of degree and depends on the fact pattern in each case.[4] Then, if the court

---

3.    Courts uniformly agree that a reduction in value resulting from 'diversion of traffic' is noncompensable, as is 'mere circuity of travel.' Although used interchangeably, these catch-phrases refer to separate and distinct legal concepts.

    'Diversion of traffic' implies a reduction in the volume of traffic passing adjacent to the property, and concomitant loss of patronage. Since government has no vested interest or duty to ensure that a business is successful when it builds roads for the future, an owner likewise can have no reasonable expectation that such roads are fixed forever. The task is to isolate 'mere' diversion of traffic cases from compensable takings which, coincidentally, divert traffic.

    Circuity of travel implies an indirect and more inconvenient means of reaching the property. The difference between 'mere circuity of travel' and unsuitable access is one of degree, and is directly related to the unique fact pattern in every case. Because the inquiry in every case is essentially fact-based, there are no hard and fast rules.

8A Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § G16.03[2][a] (3d ed., rel. 109-5/2013).

4.    When determining whether a substantial impairment exists, the court will necessarily consider the government's exercise of police power. The Minnesota Supreme Court has explained:

    All courts seem to agree that [if] the regulation or restriction falls within the state's 'police power,' no compensable loss has

(continued . . .)

decides that the State substantially impaired access, a landowner would be permitted to present evidence of the impaired access as it relates to the fair market value of their property after the taking.[5] And the jury would consider the

_____

(. . . continued)

occurred. Included in this category are the establishment of one-way streets and lanes of traffic; median strips prohibiting or limiting crossovers from one lane of traffic to another; restrictions on U-turns, left and right turns, and parking; and regulations governing the weight, size, and speed of vehicles. No compensable damages are sustained by such restrictions and regulations which govern all motorists, including abutting property owners, once they are on the traveled portion of the thoroughfare.

While courts have assumed that designating a regulation an exercise of police power prevents compensation by eminent domain proceedings, for practical purposes this is simply a convenient way of describing which activities confer a right to damages and which do not. The prohibiting or limiting of access to a highway may well be an exercise of police power in the sense that it is designed to promote traffic safety, but at the same time it may cause compensable injury to an abutting owner.

*Hendrickson v. State*, 127 N.W.2d 165, 170 (Minn. 1964).

Accordingly, the fact that the government acted under its police power does not always prevent compensation. "The distinction is not whether [the conduct at issue] is a valid exercise of police power but whether or not the property itself is taken or damaged." *Hurley*, 82 S.D. at 162, 143 N.W.2d at 725.

5.    In *Henrikson*, we considered a loss-of-access claim. The State condemned 5.29 acres of land to construct an interchange at the intersection of Interstate 229 and Louise Avenue in Sioux Falls. The State also implemented traffic controls on an existing highway as part of its larger construction project. The State installed a median on Louise Avenue, changing the access route to the landowners' remaining property by preventing direct access from southbound traffic. *Henrikson*, 1996 S.D. 62, ¶ 4, 548 N.W.2d at 808. The landowner specifically testified about her loss resulting from the change in access caused by the median. *Id.* ¶ 12, 548 N.W.2d at 809. We reversed because that evidence resulted in a jury award that "included improper damages for the median, which are not compensable under *Darnall* and *Hurley*[.]" *Id.* ¶ 21,

(continued . . .)

reasonableness of the remaining or alternate access when calculating just compensation due based upon "the difference between the fair market value of the unit before the taking and the fair market value of what remains after the taking[.]" *Hayes Estate*, 82 S.D. at 34, 140 N.W.2d at 684; *see also* 29A C.J.S. *Eminent Domain* § 440, Westlaw (database updated December 2016) ("When it is found that an impairment of the landowner's right of access to his or her property has occurred, it is for the jury to determine the extent of the impairment, and the extent of the landowner's damage as a result of the loss, or impairment, of the right of access to the property.").

[¶44.]     The determination whether a substantial impairment occurred requires a court to consider the unique fact pattern in each case.  For example, the court may consider circumstances such as the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban).  On this point, the Texas Supreme Court explained that access rights may be substantially impaired "even though normal access remain[s]

_____

(. . . continued)

548 N.W. at 811.  However, in the course of discussing the rules applicable in such a case, we inconsistently stated: "Landowners may show the reality of their limited access situation, which includes the restrictions from the median." *Id.* ¶ 15, 548 N.W.2d at 810 (citing *Hurley*, 82 S.D. at 160, 143 N.W.2d at 724; *Darnall*, 79 S.D. at 70, 108 N.W.2d at 207).  Because both this statement and our holding were based on *Darnall* and *Hurley*, and because those cases permit compensation only for changes in access that amount to substantial impairment of access, *Henrikson* must be read in accordance with our decision today.  Therefore, as stated throughout this opinion, a landowner may show a jury the reality of his or her limited-access situation only if the court first determines the change in access at issue amounts to a substantial impairment of access caused by the State's taking.

reasonably available . . . [where] access for which the property was specifically intended [has been] rendered . . . deficient." *State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 879 (Tex. 2008) (citing *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 4 (Tex. 1969)).[6] In making the legal determination whether there has been a taking, the court must distinguish between a lawful exercise of police power and a taking or damaging of a property interest because of substantial impairment of access. This is because "lawful exercise[s] of police power" are not always compensable even though those exercises may adversely impact traffic flow and established businesses. *See Darnall*, 79 S.D. at 70, 108 N.W.2d at 207.

[¶45.]     Today we clarify that before a landowner may present evidence of and recover for loss resulting from a change in access, the court must first determine that such change amounts to a substantial impairment of access—even when the State coincidentally appropriates some land. If the change in access amounts to substantial impairment and is caused by the physical taking of a landowner's property, the landowner is entitled to compensation for the substantial impairment of access as an element of severance damages. If the change in access amounts to substantial impairment and is *not* caused by the State's actual taking of the

---

6.     In *Texland*, the land for which access was impaired was zoned for heavy industrial uses in a manufacturing and warehouse district. The City constructed a viaduct for traffic over the street that abutted the property. The "piers" used to support the viaduct had only sixty feet of clearance between them, which, according to a witness, made it "most difficult, if not impossible . . . to maneuver a truck that would normally be in use, reasonably several times a day . . . to where [the] trucks would have adequate means and methods of getting in under these pilasters and columns[.]" *Texland*, 446 S.W.2d at 4. Another witness testified that "it's almost impractical to get to." *Id.*

landowner's property, then the landowner must demonstrate that he or she meets the requirements of an inverse-condemnation claimant: the landowner must also prove that the injury is peculiar to the landowner's property and not of a kind suffered by the public as a whole. In either case, the court's determination that the change in access amounts to a substantial impairment of access is a prerequisite to obtaining compensation for the change in access. To the extent that *Schuler* holds otherwise, it is overruled. Our approach today ensures that similarly situated landowners (such as neighbors) are treated similarly when they encounter a change in access. Any landowner may assert that access has been impaired; however, the procedure of the cases may differ.

[¶46.] In this case, because the circuit court applied *Schuler*, it did not determine whether the Intersection's closure substantially impaired Miller and Walsh's right to access their property. Additionally, the court did not determine whether such substantial impairment would be peculiar to Miller and Walsh's land and not of a kind suffered by the public as a whole. The court must answer both of these questions before submitting the action to the jury to determine the amount of compensation to be paid. *See* SDCL 31-19-4 ("The only issue that shall be tried by the jury . . . shall be the amount of compensation to be paid for the property taken or damaged."); *Rupert*, 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 (limiting compensation to injury peculiar to the land); *Hurley*, 82 S.D. at 164, 143 N.W.2d at 726 (permitting compensation for the substantial impairment of access). If the court determines a property interest has been taken or damaged due to substantially impaired access, then, in determining compensation, "the landowner is entitled to

have the jury informed as to all those facts which legitimately bear upon the market value of the land before and after the taking and those factors which would ordinarily influence a prospective purchaser in negotiating for the property." *Rupert*, 2013 S.D. 13, ¶ 26, 827 N.W.2d at 66 (quoting *Hayes Estate*, 82 S.D. at 34, 140 N.W.2d at 684).

[¶47.] We remand to the circuit court to determine whether Miller and Walsh's access has been substantially impaired. In this case, no evidence has shown that an impairment of access resulted from the partial taking. Thus, if a substantial impairment exists, the court must also determine if the impairment of access is peculiar to Miller and Walsh and not of a kind suffered by the public as a whole. If so, Miller and Walsh may present evidence of access damages as it relates to the fair market value of the property.

[¶48.] GILBERTSON, Chief Justice, and WILBUR and KERN, Justices, concur.

[¶49.] ZINTER, Justice, concurs specially.


[¶50.] ZINTER, Justice (concurring specially).

[¶51.] I join the majority opinion on Issue Four in its entirety. I write only to emphasize that today's Court correctly overrules *Schuler*. *See supra* ¶ 45. *Schuler's* measure of damages was based on a unique but now-repealed statute, and *Schuler* is not in accord with the almost unanimous view of courts today.

[¶52.] Miller and Walsh argue that under *Schuler*, they should be compensated for loss resulting from the Intersection's closure—even if the closure

did not substantially impair their access—because the State coincidentally appropriated a small tract of unrelated land.  In *Schuler*, the State condemned a two-acre strip of land on the western border of Schuler's property in order to build a new public highway.  A number of the buildings on Schuler's property were situated on the property's eastern border, where the property abutted an existing public road.  The jury awarded Schuler the value of the two acres taken on the western border ($20) and ten times that amount for "the damage to the sale of land" resulting from "diversion of [traffic]" ($200).[7]  *Id.* at 464, 81 N.W. at 891-92.  In affirming, the Court held that "[w]hile the damages for the diversion of [traffic] itself might not be recoverable in this action, the diversion of [traffic], together with all the other facts and circumstances proven on the trial connected with that diversion, might lessen the value of the property to the amount specified[.]"  *Id.* at 465, 81 N.W. at 892.  Thus, although the Court recognized that the loss resulting from diversion of traffic was not directly compensable under Article VI, § 13, it nevertheless upheld a jury verdict that included such loss in the posttaking market value of the remaining property.

---

7.    In *Schuler*, the Court used the phrase *diversion of travel* instead of *diversion of traffic*.  Although the phrase *diversion of travel* was in use at the time *Schuler* was decided, the continued use of that phrase is a conflation of the modern phrases *diversion of traffic* and *circuity of travel*.  *See supra* ¶ 43 n.3 (discussing the difference between these two phrases).  Because Schuler's existing access was not changed in any way—if anything, access to her property was enhanced by the construction of an additional abutting highway—*Schuler* cannot be read as a circuity-of-travel case.  Therefore, the modern phrase *diversion of traffic* is appropriate here.

[¶53.]    Miller and Walsh's reliance on *Schuler* is misplaced because the measure of compensation approved in *Schuler* was based on an inapplicable, unique, statutory measure of damages that was subsequently repealed. At the time *Schuler* was decided, the Compiled Laws of the Territory of Dakota were largely still in effect.[8] Under the Compiled Laws, Political Code § 1302 entitled a landowner to compensation from a township for any "damages sustained *by reason of laying out*, altering or discontinuing *any road*" on land belonging to the landowner. (Emphasis added.) Such damages included "the advantages and benefits the new road or alteration of an old one will confer on the claimant for the same, *as well as the disadvantages*." *Id.* (emphasis added).

[¶54.]    Although the Court did not explicitly cite § 1302 in *Schuler*, § 1302 was central to that decision. By its express terms, § 1302 applied "*in all cases* of assessing damages" for the laying out of any road. (Emphasis added.) In her brief to the Court, Schuler quoted § 1302 and argued that it governed the case in conjunction with Article VI.[9] Consistent with the statutory requirement and

---

8.    After South Dakota became a state in 1889, the Legislature adopted the Compiled Laws of the Territory of Dakota to the extent that such laws were "not repugnant to or inconsistent with" South Dakota's newly adopted constitution. 1890 S.D. Sess. Laws ch. 105, § 1. South Dakota's first comprehensive state code was not published until 1903.

9.    Schuler asserted:

> We will proceed to answer appellant's objections in the order in which they are made, first calling the court's attention to our constitution and statutes governing this case.

> Our constitution, Bill of Rights, section 13, provides: "Private property shall not be taken for public use or damaged without just compensation."

(continued . . .)

Schuler's argument, the Court used the language of § 1302 to justify the jury verdict: "[B]y the expression 'damages by diversion of travel[,]' the jury clearly intended to convey the idea that *by the laying out of the new road*, and making that the highway for general travel, the plaintiffs would be damaged in the amount stated." *Schuler*, 12 S.D. at 465, 81 N.W. at 892 (emphasis added).

[¶55.]     Significantly, the Court quoted—and primarily relied on—§ 1302 again in *Schuler's* companion case *Bockoven v. Board of Supervisors of Lincoln Township*, 13 S.D. 317, 83 N.W. 335 (1900). *Bockoven* and *Schuler* involved neighboring properties on the same highway-construction project.[10]  In determining the appropriate measure of compensation due, the Court explained: "Section 1302 of the Compiled Laws require[d] a just award of damages . . . , and in making such adjustment the advantages and benefits that the new road will confer . . ., *as well as the disadvantages that he will sustain*, must be taken into consideration." *Bockoven*, 13 S.D. at 323, 83 N.W. at 337 (emphasis added).[11]  The Court cited

_____

(. . . continued)

> Section 1302, Compiled Laws, says: "The supervisors, in all cases of assessing damages, shall estimate the advantages and benefits the new road or alteration of an old one will confer on the claimant for the same, as well as the disadvantages."

> And the same rule governs the jury in its determination. (Compiled Laws, section 1327).

10.    A review of the *Schuler* abstract of record reveals that Bockoven actually testified as a witness on Schuler's behalf in her appeal before the circuit court.  During his testimony, he also referred to his own pending appeal.

11.    As noted above, § 1302 explicitly entitled a landowner to compensation for any disadvantage sustained by the laying out of a road on land taken from the landowner.  *See supra* ¶ 53.

*Schuler* in the ensuing discussion regarding the appropriate measure of compensation under § 1302 and invoked Article VI only to reject the circuit court's instruction to the jury that the landowner could not be compensated for possible "injury from the back flow of water from the grade established[.]" *Bockoven*, 13 S.D. at 323-28, 83 N.W. at 337-38.

[¶56.] Considering § 1302's requirement that it apply "in all cases of assessing damages[,]" Schuler's reliance on § 1302 in her argument to the Court, the Court's use of § 1302's language in the *Schuler* decision, and the Court's explicit citation to § 1302 under the identical facts of *Bockoven*, there can be no doubt that the measure of compensation approved in both *Schuler* and *Bockoven* was based primarily on § 1302. However, § 1302 (allowing damages for any "disadvantages" caused by the new road) did not survive the 1919 revision of South Dakota's codified laws. Current South Dakota law—unlike § 1302—does not permit compensation for every *disadvantage* suffered by a landowner. In particular, while the diversion of traffic or mere circuity of travel are no doubt disadvantageous, they are nevertheless noncompensable under Article VI, § 13. This is the law in almost all jurisdictions. Even in the case of a partial taking, virtually all courts exclude evidence of loss resulting from the diversion of traffic or mere circuity of travel (i.e., an increase in circuity not amounting to a substantial impairment of access) in

calculating just compensation.[12] So while *Schuler* and *Bockoven* were correctly

decided under a statutory remedy available at the time, those cases (and the cases

---

12. *See Triangle, Inc. v. State*, 632 P.2d 965, 968 (Alaska 1981); *State ex rel. Sullivan v. Carrow*, 114 P.2d 896, 898 (Ariz. 1941); *Hempstead Cty. v. Huddleston*, 31 S.W.2d 300, 301 (Ark. 1930); *People ex rel. Dep't of Pub. Works v. Russell*, 309 P.2d 10, 15-16 (Cal. 1957) (en banc); *489.137 Square Feet of Land v. State ex rel. Price*, 259 A.2d 378, 380 (Del. 1969); *Div. of Admin., State Dep't of Transp. v. Capital Plaza, Inc.*, 397 So. 2d 682, 683-84 (Fla. 1981); *Cobb Cty. v. Princeton Assocs.*, 421 S.E.2d 102, 103 (Ga. Ct. App. 1992); *State, Idaho Transp. Bd. v. HI Boise, LLC*, 282 P.3d 595, 600 (Idaho 2012); *Winnebago Cty. v. Rico Corp.*, 296 N.E.2d 867, 870-71 (Ill. App. Ct. 1973); *State v. Ensley*, 164 N.E.2d 342, 345-47 (Ind. 1960); *Nelson v. Iowa State Hwy. Comm'n*, 115 N.W.2d 695, 696-97 (Iowa 1962); *Hudson v. City of Shawnee*, 790 P.2d 933, 936, 940-41 (Kan. 1990); *Commonwealth, Dep't of Highways v. Dowdy*, 388 S.W.2d 593, 595 (Ky. Ct. App. 1965); *State ex rel. Dep't of Highways v. Hoyt*, 272 So. 2d 768, 773 (La. Ct. App. 1972); *LaCroix v. Commonwealth*, 205 N.E.2d 228, 231-32 (Mass. 1965); *Jacobson v. State ex rel. State Highway Comm'n*, 244 A.2d 419, 421-22 (Me. 1968); *In re Mich. State Highway Ctrl. No. 82195-D(1)*, 140 N.W.2d 500, 503 (Mich. 1966); *Cty. of Anoka v. Blaine Bldg. Corp.*, 566 N.W.2d 331, 334 (Minn. 1997); *Muse v. Miss. State Highway Comm'n*, 103 So. 2d 839, 848 (Miss. 1958); *State ex rel. State Highway Comm'n v. Meier*, 388 S.W.2d 855, 857 (Mo. 1965) (en banc); *State v. Hoblitt*, 288 P. 181, 184 (Mont. 1930); *Painter v. State Dep't of Rds.*, 131 N.W.2d 587, 590-91 (Neb. 1964); *State v. Shanahan*, 389 A.2d 937, 939 (N.H. 1978); *State ex rel. Comm'r of Transp. v. Monmouth Hills, Inc.*, 266 A.2d 133, 136-37 (N.J. Super. Ct. App. Div. 1970), *cited with approval in State ex rel. Comm'r of Transp. v. Weiswasser*, 693 A.2d 864, 874 (N.J. 1997); *Bd. of Cty. Comm'rs v. Slaughter*, 158 P.2d 859, 863-64 (N.M. 1945); *McHale v. State*, 104 N.Y.S.2d 981, 982 (N.Y. App. Div. 1951) (per curiam), *aff'd*, 107 N.E.2d 593, 594 (N.Y. 1952); *Bd. of Transp. v. Terminal Warehouse Corp.*, 268 S.E.2d 180, 182-83 (N.C. 1980); *Richley v. Jones*, 310 N.E.2d 236, 240 (Ohio 1974); *Wolf v. Commonwealth, Dep't of Highways*, 220 A.2d 868, 871-72 (Pa. 1966); *Narciso v. State*, 328 A.2d 107, 111-12 (R.I. 1974); *State ex rel. Dep't of Transp. v. Henrikson*, 1996 S.D. 62, ¶ 21, 548 N.W.2d 806, 811; *City of Memphis v. Hood*, 345 S.W.2d 887, 890-91 (Tenn. 1961); *State v. Schmidt*, 867 S.W.2d 769, 770 (Tex. 1993); *State Rd. Comm'n v. Utah Sugar Co.*, 448 P.2d 901, 902-03 (Utah 1968); *State Highway Comm'r v. Howard*, 195 S.E.2d 880, 880 (Va. 1973) (per curiam); *Ehrhart v. Agency of Transp.*, 904 A.2d 1200, 1205-06 (Vt. 2006); *State v. Fox*, 332 P.2d 943, 946 (Wash. 1958); *State Highway Comm'n v. Scrivner*, 641 P.2d 735, 738-39 (Wyo. 1982); *cf. State Dep't of Highways, Div. of Highways v. Davis*, 626 P.2d 661, 666-67 (Colo. 1981) (en banc) (holding landowner's loss resulting from advertising

(continued . . .)

that rely on *Schuler*) may no longer be relied on in determining the measure of compensation appropriate under Article VI, § 13. As explained in the majority opinion, Miller and Walsh are not entitled to compensation for loss resulting from the Intersection's closure unless the closure substantially impaired access to their property. *See supra* ¶ 46-47.

---

(. . . continued)
restrictions on landowner's property noncompensable as an element of severance damages). *But see Pike Cty. v. Whittington*, 81 So. 2d 288, 290-92 (Ala. 1955); *S.C. State Highway Dep't v. Wilson*, 175 S.E.2d 391, 395 (S.C. 1970).